RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0223p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

TAMMY M. BRAWNER,

          *Plaintiff-Appellant,*

    *v.*

SCOTT COUNTY, TENNESSEE,

          *Defendant-Appellee.*

No. 19-5623

───────────────

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:17-cv-00108—J. Ronnie Greer, District Judge.

Argued:  June 1, 2020

Decided and Filed:  September 22, 2021

Before:  CLAY, WHITE, and READLER, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:**  Richard Everett Collins, II, STANLEY, KURTZ & COLLINS, PLLC, Knoxville, Tennessee, for Appellant.  Caitlin C. Burchette, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellee.  **ON BRIEF:**  Richard Everett Collins, II, STANLEY, KURTZ & COLLINS, PLLC, Knoxville, Tennessee, for Appellant.  Caitlin C. Burchette, Arthur F. Knight, III, TAYLOR & KNIGHT, GP, Knoxville, Tennessee, for Appellee.

    WHITE, J., delivered the opinion of the court in which CLAY, J., joined.  READLER, J. (pp. 20–33), delivered a separate opinion concurring in part and dissenting in part.

———————————

**OPINION**

———————————

HELENE N. WHITE, Circuit Judge.　Tammy Brawner appeals the district court's grant of judgment as a matter of law under Rule 50(a), arguing that she presented sufficient evidence for a jury to find that the multiple seizures she suffered while a pretrial detainee in the Scott County jail were the result of Scott County's unconstitutional policies or customs.　Because Brawner presented sufficient evidence for a jury to find Scott County liable for her injuries based on two of its policies, we REVERSE and REMAND IN PART, and otherwise AFFIRM.

**I.**

We begin with a brief explanation of relevant state law, county policy, and county custom.

*Initial Medical Screenings.*　Tennessee law requires certain jails to screen all newly arrived detainees for serious medical conditions.　Tenn. Comp. R. & Reg. 1400-01-.13(8)(a)-(e). Scott County implemented these state regulations through a written questionnaire.　Among other things, the questionnaire asked whether the detainee has a serious medical condition, whether the detainee needs to continue prescribed medication, and whether the detainee is currently thinking about suicide.　According to Scott County policy, if a detainee answers yes to any of these questions, medical staff, if on duty, should respond; otherwise, EMS should be notified.　The questionnaire also asks the administering officer to determine whether the detainee is capable of understanding the questions asked.　If the officer believes the detainee is incapable of doing so, the form instructs the officer to call the medical staff if the detainee's incapacity is caused by mental-health issues, suicidal thoughts, intellectual disability, acquired brain injury, substance abuse, or some combination thereof.

There is no written policy stating which particular jail staff member should conduct this screening.　The custom at the Scott County jail was for the booking officer (who was not medically trained) to do so.　The practice was for the officer to create two copies of the

completed intake form and send one to the jail nurse, who would place the form in the detainee's individual medical file.

*Prescribed Medication.*  The Scott County jail had a general policy against administering controlled substances to detainees.  Prescribed medications were permitted to be administered to detainees only if expressly ordered by the jail doctor; all controlled substances were banned, even when a detainee had been taking the substance pursuant to a prescription.

*Physical Examination.*  Tennessee law requires all detainees to undergo a more complete medical examination within fourteen days of admission.  Among other conditions, the examiner must check for "medications taken" and "special health requirements."  Tenn. Comp. R. & Reg. 1400-01-.13 (9)(b).  In Scott County, a jail nurse customarily conducts the examination, with the results reviewed by a jail doctor.

## II.

*Brawner Is Detained and Screened.*  Following revocation of her bail, Brawner was detained at the Scott County jail on June 29, 2016.  Upon her arrival, Brawner was medically screened by the booking officer.  On a written questionnaire, Brawner answered that she needed to continue her prescription medications, listing the four medications she had been taking, including three controlled substances: suboxone, clonazepam, and gabapentin.  At the same time, she denied having a serious medical condition that required attention and denied having epileptic seizures.  The officer noted that Brawner did not appear capable of understanding all the questions asked.

There is conflicting evidence about whether Brawner's intake form ever made it to the jail nurse, Nurse Massengale.  The County stipulated that "[i]t is the Jail's longstanding practice for the booking officer, [Tucker], to print two copies of the Inmate Medical Form listing prescription medication or other medical issues.  One copy is placed in the inmate's custodial (or jail) file, and the second copy is placed in Nurse Massengale's 'box' . . . ." R. 155, PID 1063.  But at trial, Nurse Massengale claimed that she did not see the list of Brawner's medications until over a week after the initial screening.

*Brawner's Seizures*.  On July 7, eight days after her booking, Brawner suffered multiple seizures and was taken to a local hospital.  A treating physician diagnosed her with epilepsy, recommended that she see a physician within two days, and prescribed Phenobarbital, an anti-epilepsy medication, for her seizures.  The hospital was informed that Brawner had four prescribed medications but apparently was not told that Brawner had not been permitted to take those medications.  Upon returning to the jail the same day, Brawner was examined by Nurse Massengale.  At the jail doctor's instruction, Nurse Massengale discontinued Brawner's Phenobarbital and instead administered daily doses of Dilantin, an anti-seizure medication the doctor believed would better treat Brawner's condition.

Four days later, Brawner suffered another seizure.  The seizure occurred early in the morning, when Nurse Massengale was not present.  A corrections officer called the jail doctor, who directed the officer to record Brawner's vitals and administer Dilantin.

A day later, July 12, (and within fourteen days of Brawner's initial detention), Nurse Massengale performed the state-required physical examination.  She noted that Brawner suffered from a "seizure disorder or cerebral trauma."  R. 207, PID 1401.  The jail doctor was not personally involved in the examination but reviewed and signed off on it.

Two days after the exam, officers observed Brawner acting erratically, including by drinking out of the toilet.  Believing that this behavior could be related to Brawner's history of mental-health issues, Nurse Massengale contacted a licensed social worker.  The social worker, who was aware of Brawner's previous seizures, conducted an evaluation, and concluded that Brawner's symptoms were most likely the result of drug withdrawal.  It does not appear that Nurse Massengale consulted with the jail doctor after receiving the evaluation.

Early the next morning, officers observed Brawner experience another seizure.  The officers did not call 911.  One hour later, Brawner's cellmates reported yet another seizure.  The officers again did not call 911, as they recorded that Brawner's blood pressure and pulse appeared to be normal.  The officers gave Brawner her daily dose of Dilantin.

Another hour passed and Brawner's cellmates again reported that Brawner was experiencing seizures.  By this point, Nurse Massengale had arrived at the jail.  She placed

Brawner under 15-minute-interval medical observation. Within an hour, Brawner suffered six more seizures. Nurse Massengale called the jail doctor, who in turn instructed her to give Brawner a dose of valproic acid. Not long after, Brawner had three more seizures, at which point Nurse Massengale called 911. Brawner suffered three more seizures at the hospital before being transported by helicopter to another hospital's intensive-care unit.

*Brawner Files Suit Against Scott County and County Employees.* Brawner sued Scott County and various County jail staff alleging inadequate medical care and that corrections officers tased her in response to her seizures. Brawner claimed that as a result of prolonged seizure activity, she suffered permanent and debilitating injuries while being held by Scott County, making Defendants liable under § 1983 for violating her Fourteenth Amendment rights to adequate medical care and to be free from excessive force. Brawner and her husband also brought state-law claims.

Before trial, the parties stipulated to the dismissal of the individual defendants, leaving Scott County as the sole defendant. And during trial, the parties agreed to dismiss the state-law claims against Scott County, so that all that remained were Brawner's claims alleging that Scott County violated her Fourteenth Amendment rights.

After Brawner presented her case at trial, the district court granted Scott County's Rule 50(a) motion for judgment as a matter of law. As to Brawner's medical-care claim, the district court first addressed whether Brawner had presented sufficient evidence to establish that any individual violated her constitutional rights by being deliberately indifferent to her serious medical needs. The court held that Brawner's medical need was sufficiently serious to satisfy the objective component of a deliberate-indifference claim, but she failed to show that the jail staff were subjectively deliberately indifferent to her serious medical need because she did not show that the staff were actually aware of facts from which an inference could be drawn that there was a substantial risk of serious harm. Nor, according to the district court, did the jail staff actually draw that inference—the staff followed standard booking procedure and responded to Brawner's seizures by monitoring her and calling for medical aid. And because seizure suppression was not the most prevalent use of Brawner's medications, those medications, the district court explained, were not evidence from which the staff should have inferred that

Brawner was at risk of seizures. The district court therefore concluded that Brawner's medical-care claim against the County could not succeed because she had not established that any individual had violated her constitutional rights.

The district court also addressed Brawner's theories of county liability. The district court reasoned that Brawner did not show that Scott County was separately liable due to inadequate training policies and customs, that Scott County was deliberately indifferent to any such inadequacy, or that any alleged inadequacy caused Brawner's injuries.

The district court additionally rejected Brawner's claims based on Scott County's policies and customs regarding prescription medications and medical supervision because Brawner had not shown that the policy or custom was a part of a recurrent pattern of constitutional violations by Scott County. And it rejected Brawner's claim that Scott County officials, rather than helping Brawner during her seizures, tased her instead, in violation of her Fourteenth Amendment right to be free from excessive force, a claim Brawner has abandoned on appeal.

### III.

We review de novo a district court's decision to grant judgment as a matter of law. *Hanover Am. Ins. Co. v. Tattooed Millionaire Ent., LLC*, 974 F.3d 767, 779 (6th Cir. 2020) (citing *K&T Enters. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996)). Judgment as a matter of law is appropriate "only if reasonable minds could not come to a conclusion other than one favoring the movant." *Id.* In making that assessment, we view the evidence in the light most favorable to Brawner and draw all reasonable inferences in her favor. *Id.*

### A.

The Eighth Amendment protects an inmate from "cruel and unusual punishments," U.S. CONST. amend. VIII, which includes a right to be free from deliberate indifference to an inmate's serious medical needs, *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018). A deliberate-indifference claim under the Eighth Amendment has an objective and a subjective component. *Id.* at 937-38. To meet the objective component, the plaintiff must show that the medical need is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To meet the subjective

component, the plaintiff must show that "an official kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Id*. at 837. An express intention to inflict unnecessary pain is not required. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Still, the plaintiff must demonstrate that the official was aware of facts from which an inference of substantial risk of serious harm to inmate health or safety could be drawn and that the official actually drew the inference. *Farmer*, 511 U.S. at 837.

We have "historically analyzed Fourteenth Amendment pretrial detainee claims and Eighth Amendment prisoner claims 'under the same rubric.'" *Richmond*, 885 F.3d at 937 (quoting *Villegas v. Metro. Gov't of Nashville*, 709 F.3d 563, 568 (6th Cir. 2013)). Brawner argues, however, that the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), eliminates the subjective element of a pretrial detainee's deliberate-indifference claim.

In *Kingsley*, the Supreme Court addressed the standard applicable to an excessive-force claim brought by a pretrial detainee, i.e., whether "a pretrial detainee must show that the officers were *subjectively* aware that their use of force was unreasonable, or only that the officers' use of that force was *objectively* unreasonable." 576 U.S. at 391-92. The Court held that the appropriate standard is objective. *Id*. at 392. In doing so, the Court reiterated the principles that apply to claims brought by pretrial detainees, whose constitutional status differs from that of convicted prisoners:

> Several considerations have led us to conclude that the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one. For one thing, it is consistent with our precedent. We have said that "the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham* [*v. Connor*, 490 U.S. 386,] 395, n. 10 [109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)]. And in *Bell* [*v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)], we explained that such "punishment" can consist of actions taken with an "expressed intent to punish." [*Id.*] at 538, 99 S.Ct. 1861. But the *Bell* Court went on to explain that, in the absence of an expressed intent to punish, a pretrial detainee can nevertheless prevail by showing that the actions are not "rationally related to a legitimate nonpunitive governmental purpose" or that the actions "appear excessive in relation to that purpose." *Id.*, at 561, 99 S.Ct. 1861. The *Bell* Court applied this latter objective standard to evaluate a variety of prison conditions, including a prison's practice of double-bunking. In doing so, it did not consider the prison officials' subjective beliefs about the policy. *Id.*, at 541–543, 99 S.Ct. 1861. Rather, the Court

examined objective evidence, such as the size of the rooms and available amenities, before concluding that the conditions were reasonably related to the legitimate purpose of holding detainees for trial and did not appear excessive in relation to that purpose. *Ibid.*

576 U.S. at 397-98; *see also id.* at 400 ("The language of [the Eighth Amendment's Cruel and Unusual Punishments Clause and the Fourteenth Amendment's Due Process Clause] differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" (citations omitted)). However, *Kingsley* did not address whether an objective standard applies in other Fourteenth Amendment pretrial-detainment contexts.

Although the facts here, viewed in the light most favorable to Brawner, support a finding of deliberate indifference under either *Farmer*'s subjective[1] or *Kingsley*'s objective standard, we must address the issue because the standard will be relevant on remand.[2]

---

[1]As we explain below, a reasonable jury could conclude that Nurse Massengale knew of the substantial risk of serious harm to Brawner from the stipulated routine/habit evidence that Brawner's medical form showing she was currently taking prescription narcotics was placed in her mailbox, her awareness of Brawner's seizures, testimony from medical professionals that they would never recommend abrupt discontinuation of Brawner's medications due to the risk of seizures, and evidence that a social worker identified Brawner's erratic behavior to be from medication withdrawal. *See Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

[2]The dissent claims that we need not address this issue because the district court "can resolve on remand any outstanding issues as needed," noting that Brawner proposed a verdict form that would allow the jury to indicate whether she satisfied the objective-only component. Dissent at 25. But the district court already decided the issue, stating "in my view until the Sixth Circuit changes the law, these claims have both an objective and a subjective component, and so I would have charged this jury, or will charge the jury if this goes," with both an objective and subjective component. R. 209, PID 1778-79. Taking the district court at its word, deciding the issue is necessary so the jury can be properly instructed on remand. These circumstances distinguish every one of the cases cited by the dissent. Indeed, the majority of cases where we decline to reach the issue are affirmances of dismissals, where the plaintiff loses under both standards. In the three that are not straight affirmances, *Troutman v. Louisville Metro Department of Corrections*, 979 F.3d 472 (6th Cir. 2020); *Bard v. Brown County*, 970 F.3d 738 (6th Cir. 2020); and *Cameron v. Bouchard*, 815 F. App'x 978 (6th Cir. 2020), the district court either did not decide or did not even acknowledge the issue, leaving us with no reasoning to review. *See, e.g.*, *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 443 (6th Cir. 2021) ("This court does not ordinarily address new arguments raised for the first time on appeal." (quoting *Mich. Bell Tel. Co. v. Strand*, 305 F.3d 580, 590 (6th Cir. 2002))); *see also Lemoine v. United States*, 819 F. App'x 358, 364 (6th Cir. 2020) ("[L]ike the Supreme Court, we are a court of review, not first view." (quoting *United States v. Houston*, 792 F.3d 663, 669 (6th Cir. 2015))). Further, in *Bard*, neither party briefed on appeal whether *Kingsley* requires modification of the standard for deliberate-indifference claims by pretrial detainees, and in *Troutman*, only one party did so.

The dissent also suggests that we are disregarding the principle of constitutional avoidance by deciding the *Kingsley* issue. Dissent at 25. But constitutional avoidance is not applicable here. That term refers to "[t]he so-called canon of constitutional avoidance . . . [,] an interpretive tool[] counseling that ambiguous statutory language

The Second, Seventh, and Ninth Circuits have held that *Kingsley* requires modification of the subjective component for pretrial detainees bringing Fourteenth Amendment deliberate-indifference claims. *Darnell v. Pineiro*, 849 F.3d 17, 34-35 (2d Cir. 2017); *Miranda v. County of Lake*, 900 F.3d 335, 352 (7th Cir. 2018); *Gordon v. County of Orange*, 888 F.3d 1118, 1124-25 (9th Cir. 2018). On the other hand, the Fifth, Eighth, and Eleventh Circuits have retained, with minimal analysis, the subjective component for deliberate-indifference Fourteenth Amendment claims despite *Kingsley*. *Cope v. Cogdill*, 3 F.4th 198, 207 & n.7 (5th Cir. 2021) (concluding in a footnote that the court is bound by prior precedent applying a subjective component); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) (reasoning only that "*Kingsley* does not control because it was an excessive force case, not a deliberate indifference case"); *Dang by & through Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) (explaining that "[w]e cannot and need not reach this question" because *Kingsley* does not squarely conflict with prior precedent, and reasoning, in any event, that the plaintiff had established only negligence, which is still insufficient under *Kingsley*). More recently, the Tenth Circuit joined the Fifth, Eighth, and Eleventh Circuits. *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020). In the Tenth Circuit's view, *Kingsley* does not require modification of the deliberate-indifference standard for pretrial detainees because *Kingsley* turned on considerations unique to the excessive-force context rather than on the status of the plaintiff; the nature of a deliberate-indifference claim requires a subjective component; and principles of stare decisis weigh against overruling its precedent applying a subjective component. *Id.*

Our circuit has not yet decided this issue, but some members of this court have expressed "serious doubt" whether a deliberate-indifference claim under the Fourteenth Amendment retains a subjective component in light of *Kingsley*, *Richmond*, 885 F.3d at 938 n.3, or have expressly found that the subjective component no longer applies to these claims in light of *Kingsley*,

---

be construed to avoid serious constitutional doubts," *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) (citation omitted); *see also Hamama v. Adducci*, 946 F.3d 875, 880 (6th Cir. 2020) ("Constitutional avoidance permits a court to choose between competing plausible interpretations of a statutory text, one of which implicates constitutional problems the other would avoid." (internal quotation marks and citation omitted)), or to the principle counseling courts against deciding cases on constitutional grounds when they can dispose of a case on alternative grounds, *see, e.g.*, *Torres v. Precision Indus., Inc.*, 938 F.3d 752, 755 (6th Cir. 2019). Here, the claim at issue alleges a violation of the Constitution, and the only issues before us are whether a reasonable jury could find that the evidence presented establishes a constitutional violation and the proper standard for determining whether such a violation occurred. There are, accordingly, no statutory or alternative grounds on which to decide this case.

*Griffith v. Franklin County*, 975 F.3d 554, 587-89 (6th Cir. 2020) (Clay, J., concurring in part and dissenting in part).

**B.**

Because the question is whether *Kingsley* renders *Farmer*'s subjective prong of the deliberate indifference test inapplicable to claims brought by pretrial detainees under the Fourteenth Amendment, it is useful to examine the Court's decision in *Farmer*. *Farmer* began with the understanding, based on prior cases, that "'deliberate indifference' to inmate health or safety" is the required state of mind in conditions-of-confinement claims brought under the Eighth Amendment. 511 U.S. at 834 (citations omitted). Looking to prior cases, the Court explained:

> While *Estelle* [*v. Gamble*, 429 U.S. 97 (1976)] establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result. . . .
>
> With deliberate indifference lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Courts of Appeals have routinely equated deliberate indifference with recklessness. It is, indeed, fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.

*Id.* at 835-36 (footnotes and citations omitted). But, the Court noted, "recklessness" has multiple definitions, depending on the context:

> The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. The criminal law, however, generally permits a finding of recklessness only when a person disregards a risk of harm of which he is aware. The standards proposed by the parties in this case track the two approaches (though the parties do not put it that way): petitioner asks us to define deliberate indifference as what we have called civil-law recklessness, and respondents urge us to adopt an approach consistent with recklessness in the criminal law.

*Id.* at 836-37 (footnote and citations omitted).

The *Farmer* Court opted for the criminal/subjective definition finding that it best comports with the text of the Eighth Amendment:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments."* An act or omission unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, *cannot under our cases be condemned as the infliction of punishment*.

*Id.* at 837-38 (emphasis added and citations omitted).

In addressing its choice of a subjective standard for deliberate indifference, the Court further explained that the term itself has no dispositive intrinsic meaning:

> Our decision that Eighth Amendment liability requires consciousness of a risk is thus based on the Constitution and our cases, not merely on a parsing of the phrase "deliberate indifference." And we do not reject petitioner's arguments for a thoroughly objective approach to deliberate indifference without recognizing that on the crucial point (whether a prison official must know of a risk, or whether it suffices that he should know) the term does not speak with certainty. Use of "deliberate," for example, arguably requires nothing more than an act (or omission) of indifference to a serious risk that is voluntary, not accidental. *Cf. Estelle,* 429 U.S., at 105, 97 S.Ct., at 291–292 (distinguishing "deliberate indifference" from "accident" or "inadverten[ce]"). And even if "deliberate" is better read as implying knowledge of a risk, the concept of constructive knowledge is familiar enough that the term "deliberate indifference" would not, of its own force, preclude a scheme that conclusively presumed awareness from a risk's obviousness.

*Id.* at 840 (alteration in original). The Court also made clear that "[b]ecause 'deliberate indifference' is a judicial gloss, appearing neither in the Constitution nor in a statute," the definition provided by the Court in one context is not necessarily appropriate in another. *Id.*

(rejecting argument that the test for deliberate indifference described in *Canton v. Harris*, 489 U.S. 378 (1989), applied to Farmer's deliberate-indifference claim due to the different context of the two claims).

It is clear, then, that the *Farmer* Court adopted the subjective component of the test for deliberate indifference under the Eighth Amendment based on the language and purposes of that amendment, focusing particularly on "punishments," and not on any intrinsic meaning of the term. We thus reject the Tenth Circuit's argument that the term "deliberate indifference" itself demands a subjective standard. *See Strain*, 977 F.3d at 992. We also reject any argument that *Farmer* controls here until the Supreme Court tells us otherwise, because *Farmer* cannot fairly be read to require subjective knowledge where the Eighth Amendment does not apply, and the Supreme Court has not held that *Farmer*'s subjective standard applies to Fourteenth Amendment pretrial-detainee medical-care claims.

Scott County additionally argues that we are bound by our own precedent applying a subjective standard to deliberate-indifference claims by pretrial detainees both before and after *Kingsley*. We disagree. As other circuits have recognized, *Kingsley* is an inconsistent Supreme Court decision that requires modification of our caselaw, *Miranda*, 900 F.3d at 352; *Darnell*, 849 F.3d at 36, and therefore we may amend our standard to be consistent with *Kingsley*, *see Brumbach v. United States*, 929 F.3d 791, 795 (6th Cir. 2019) (explaining that a prior published opinion may only be overruled if there is an "'inconsistent decision of the Supreme Court or [by] . . . a decision of the en banc court" (quoting *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 689 (6th Cir. 1985))). Further, the post-*Kingsley* decisions the County cites expressly reserved the question whether *Kingsley* requires modification of the deliberate-indifference standard. *See Martin v. Warren County*, 799 F. App'x 329, 337 n.4 (6th Cir. 2020) ("Because Martin at best shows negligent conduct . . . , we leave the *Kingsley* question for another day."); *Richmond*, 885 F.3d at 938 n.3 (recognizing that *Kingsley* "calls into serious doubt whether" a subjective component still applies but declining to resolve the issue because neither party had addressed it). And other panels of this court that have recognized the issue have declined to resolve it without suggesting that they could not do so absent rehearing en banc. *See, e.g.*, *Griffith*, 975 F.3d at 570-71.

Given *Kingsley*'s clear delineation between claims brought by convicted prisoners under the Eighth Amendment and claims brought by pretrial detainees under the Fourteenth Amendment, applying the same analysis to these constitutionally distinct groups is no longer tenable. *See, e.g.*, *Miranda*, 900 F.3d at 350 ("Pretrial detainees stand in a different position: they have not been convicted of anything, and they are still entitled to the constitutional presumption of innocence. Thus, the punishment model is inappropriate for them." (citing *Kingsley*, 576 U.S. at 400-01)); *Darnell*, 849 F.3d at 35 ("After *Kingsley*, it is plain that punishment has no place in defining the *mens rea* element of a pretrial detainee's claim under the Due Process Clause. Unlike a violation of the Cruel and Unusual Punishments Clause, an official can violate the Due Process Clause of the Fourteenth Amendment without meting out any punishment, which means that the Due Process Clause can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm."). Accordingly, we agree with the Second, Seventh, and Ninth Circuits that *Kingsley* requires modification of the subjective prong of the deliberate-indifference test for pretrial detainees.

What then is required to establish deliberate indifference in this context? Mere negligence is insufficient. A defendant must have not only acted deliberately (not accidentally), but also recklessly "in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer*, 511 U.S. at 836 (describing, and rejecting as inapplicable to Eighth Amendment deliberate-indifference claims, the civil standard for recklessness). A pretrial detainee must prove "more than negligence but less than subjective intent—something akin to reckless disregard." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016) (en banc); *see Darnell*, 849 F.3d at 35 ("[T]he pretrial detainee must prove that the defendant-official acted [or failed to act] intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety."); *Griffith*, 975 F.3d at 589 (Clay, J., concurring in part and dissenting in part) (explaining that a pretrial detainee must prove that the defendant acted "intentionally to ignore [her] serious medical need or recklessly failed to act with reasonable care to mitigate the risk that the serious medical need posed to the pretrial

detainee, even though a reasonable official in the defendant's position would have known, or should have known, that the serious medical need posed an excessive risk to the pretrial detainee's health or safety").

## C.

With no claims against individual officers remaining, Brawner alleges that various Scott County policies and customs can serve as a basis for imposing liability on the County. As an initial matter, the parties dispute whether Brawner's claim against the County depends on her showing that a county actor violated her constitutional rights. We have not always been consistent in discussing this issue. *Compare, e.g.*, *Watkins v. City of Battle Creek*, 273 F.3d 682, 687 (6th Cir. 2001) ("If no constitutional violation by the individual defendants is established, the municipal defendants cannot be held liable under § 1983." (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986))), *with Winkler v. Madison County*, 893 F.3d 877, 900 (6th Cir. 2018) ("Despite the fact that *Watkins* broadly states that the imposition of municipal liability is contingent on a finding of individual liability under § 1983, other cases from this circuit have indicated that the principle might have a narrower application."). But it makes no difference here because Brawner presented evidence from which a reasonable jury could find that Nurse Massengale violated Brawner's constitutional rights and that this violation was the result of the County's policies.

To meet her burden to show that Nurse Massengale violated her constitutional right to adequate medical care, Brawner needed to present evidence from which a reasonable jury could find (1) that she had an objectively serious medical need; and (2) that Nurse Massengale's action (or lack of action) was intentional (not accidental) and she either (a) acted intentionally to ignore Brawner's serious medical need, or (b) recklessly failed to act reasonably to mitigate the risk the serious medical need posed to Brawner, even though a reasonable official in Nurse Massengale's position would have known that the serious medical need posed an excessive risk to Brawner's health or safety.

Upon admittance to the jail, Brawner filled out an intake form and listed several prescription medications that she was taking and needed to continue taking, including the

controlled substances suboxone, clonazepam, and gabapentin. Although Nurse Massengale testified that she never received Brawner's form in her mailbox when Brawner was admitted to the jail, there is evidence that Captain Tucker's practice was to place a copy of Brawner's form in Nurse Massengale's mailbox. Further, there was evidence that Nurse Massengale became aware of the seizures and the intake form shortly after Brawner was discharged from the hospital on July 7. Based on this evidence, a reasonable jury could infer that Nurse Massengale received the form and failed to take the necessary steps to ensure that Brawner received her medications or suitable substitutes.

Brawner's medical expert testified that, given Nurse Massengale's training and experience, she should have recognized that Brawner needed her medications or, if she had any doubts, immediately consulted with the jail doctor. Further, Brawner's treating physician testified that abrupt discontinuation of any one of the three controlled substances Brawner was taking could lead to seizures, that the abrupt discontinuation of all three at once makes it even more likely that a patient would suffer seizures, that he would never recommend abrupt discontinuation of suboxone because "it's inhumane to do something like that," and that he would highly recommend not to abruptly discontinue clonazepam because of the risk of seizures. App'x at 54. Brawner's medical expert testified similarly that he would never recommend abruptly discontinuing the three controlled substances Brawner was taking. Additionally, the social worker who was asked to evaluate Brawner after she began acting erratically figured out that Brawner's symptoms were most likely the result of drug withdrawal, and Nurse Massengale still failed to act or even explore that possibility with the jail doctor. Based on this evidence and considering that suboxone is a well-known opioid-withdrawal medication, "a jury could reasonably find that [Brawner] had a serious need for medical care that was 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004) (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)). And given Nurse Massengale's additional medical training and experience consulting with detainees about their medications as compared to a layperson, a jury could even more easily infer that she recognized the need for a doctor's attention and responded unreasonably. *See Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 846 (6th Cir. 2002) (determining that the evidence supported a finding of deliberate

indifference by a nurse based on the information known by the nurse or what would have been obvious to her).  Because a reasonable jury could find that Brawner had an objectively serious medical need, and that Nurse Massengale was either subjectively aware of the risk to Brawner from suddenly discontinuing her medications and failed to respond reasonably to that risk, or that Nurse Massengale recklessly failed to act reasonably to mitigate the risk that the serious medical need posed to Brawner, Brawner presented a jury question as to whether Nurse Massengale violated her constitutional rights.

## D.

To present a jury question on Scott County's liability, Brawner had the additional burden to present evidence that would allow a reasonable jury to find that the constitutional harm was caused by the County's policies.  To do that, she had to "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that [her] particular injur[ies] w[ere] incurred due to execution of that policy." *Morgan v. Fairfield County*, 903 F.3d 553, 566 (6th Cir. 2018) (second and third alterations in original) (quoting *Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003)).

Brawner presented evidence that would allow a reasonable jury to find that her injuries were incurred due to the execution of the fourteen-day and no-controlled-substances policies.  As discussed above, Scott County's fourteen-day policy allowed the jail to wait fourteen days before giving detainees a medical examination, which includes among other things, checking for required medications.  Captain Tucker testified that the policy sometimes results in the untimely administration of medical services.  Further, even after Brawner had a seizure and was returned to jail from the hospital, Nurse Massengale still did not complete her medical examination until the end of the fourteen-day period, and Brawner was never prescribed the medications she had previously been taking or provided with an alternative treatment plan.  Although Nurse Massengale testified that she could prioritize detainees to be seen earlier if they were on life-sustaining medications, the chain of events in this case suggests that this authority and the County's fourteen-day policy are insufficient to guard against the consequences to detainees like Brawner who are admitted while on medications that are not technically life-sustaining but where the abrupt discontinuation of those medications could have tragic consequences.

Further, Brawner would never have received three of her medications because of the jail's blanket ban on controlled substances. Brawner's medical expert and one of her treating physicians testified that they would never recommend abrupt discontinuation of the medications she was taking given the possibility of seizures, and Brawner's medical expert testified that the abrupt discontinuation of these medications caused her seizures. Additionally, we have previously suggested that abrupt discontinuation of substances that could lead to withdrawal symptoms and potential seizures might pose constitutional problems. *See Bruederle v. Louisville Metro Gov't*, 687 F.3d 771, 777 (6th Cir. 2012); *French v. Daviess County*, 376 F. App'x 519, 522 (6th Cir. 2010).

In *Bruederle*, the plaintiff was booked into the jail on Friday night and had a seizure two days later, on Sunday evening. 687 F.3d at 773-74. Due to the jail's procedures requiring a pharmacy to verify a detainee's prescriptions and requiring a jail doctor—a position not staffed on weekends—to screen and approve all prescriptions, the plaintiff could not have received any prescriptions until the day after his seizure. *Id.* at 774-75. The plaintiff argued that the municipality was liable because the municipality had a no-narcotics policy that resulted in his being denied his prescriptions for hydrocodone and Xanax, the withdrawal of which led to his seizure, but he did not challenge the jail's policies regarding prescription verification and approval. *Id.* at 774-77. After noting constitutional concerns about blanket no-narcotics policies, which the municipality argued it did not even have, we rejected the detainee's argument because, given the short time between the detainee's intake and his seizure, and the jail's procedures requiring prescription verification and approval, the plaintiff

> could not have received any medication until Monday, a day after the seizure took place, because there was no physician available to review and approve prescription requests. Even if we were to accept Bruederle's argument that the jail has a "no narcotics" policy, it had no opportunity to apply it in this case. Nor did the jail have a chance to provide alternative medication that might have addressed Bruederle's pain needs and reduced the risk of withdrawal.

*Id.* at 777. Unlike in *Bruederle*, here there was plenty of time for Brawner to receive her prescribed medications or alternative medications in the eight days between when she first arrived at the jail and when she suffered her first seizure, or in the seven days after that seizure before she suffered the series of seizures that resulted in her severe injuries. Thus, a reasonable

jury could find that Nurse Massengale's failure to treat Brawner appropriately was due to the County's application of the no-narcotics policy, which caused Brawner's injuries.

In short, because it is undisputed that the jail had a ban on controlled substances, and there was testimony that the abrupt discontinuation of Brawner's prescriptions caused her seizures, Brawner presented sufficient evidence to identify the problematic policy, connect it to the County, and show that the policy caused her injuries. *Morgan*, 903 F.3d at 566; *see also Ford v. County of Grand Traverse*, 535 F.3d 483, 498 (6th Cir. 2008) (finding sufficient evidence of causation where a doctor's testimony that Dilantin would have prevented the plaintiff's seizures "provided a basis for finding that Ford would not have suffered a seizure had she been given Dilantin within a few hours of her arrival at the jail").

We therefore reverse the district court's judgment for Scott County.

**E.**

We agree with the district court, however, that Brawner failed to present sufficient evidence for a jury to find Scott County liable on her other theories. Brawner challenged Scott County's custom of using non-medically trained booking officers to perform initial screenings. Brawner asserts that a medically trained staff member administering the initial questionnaire would have recognized that she was at risk of seizures. However, County practice did incorporate a medical professional into the screening process. As Brawner acknowledges, it was the custom in Scott County for the booking officer to provide a copy of the questionnaire to a nurse. Brawner claims that this medical review was also marred by the County's initial processing policy because the booking officer in Brawner's case failed to inform medical staff that Brawner was incapable of understanding all intake questions. But Brawner herself indicated that she understood each question she was asked. And, to the extent the booking officer incorrectly recorded answers or failed to contact the medical staff, that at most reflects negligent conduct, not conduct attributable to a Scott County policy.

Brawner lastly highlights Scott County's policy of staffing only one nurse, and only during weekdays. Brawner asserts the policy is unconstitutional because when she suffered seizures, "there was no medical personnel onsite to recognize a true emergency, [so] correctional

officers concluded that . . . Brawner was 'faking it,' and proceeded to punish her with a Taser gun." Appellant's Brief at 34. It follows, she says, that her taser injury resulted directly from the County's inadequate jail medical-staffing policy. We disagree. As the district court observed, there is no evidence in the record surrounding the circumstances leading to the alleged taser incident; Brawner did not testify and the officers all denied tasing her. The only evidence presented to the jury came from a medical report from months after the alleged incident, where the medical provider wrote: "She . . . was in the jail back in July for failure to appear in court, when she started having seizures. She had 30 witnessed by other inmates, but the cops thought she was faking and tazed her and put her in solitary." Pl.'s Ex. 9; *see also* R. 207 at 119. Although tasing a pretrial detainee who is experiencing a seizure is unreasonable, there is insufficient evidence to determine whether medical personnel were on site when the tasing occurred. Accordingly, we agree with the district court that Brawner presented insufficient evidence supporting her theory that she was tased unreasonably due to Scott County's medical-staffing policy.

## IV.

For the reasons set forth above, we **REVERSE** the district court's grant of judgment as a matter of law on Brawner's claims based on Scott County's fourteen-day and no-narcotics policies and **REMAND** for proceedings consistent with this opinion. We otherwise **AFFIRM.**

---

**CONCURRING IN PART AND DISSENTING IN PART**

---

CHAD A. READLER, Circuit Judge, concurring in part and dissenting in part. I concur in Section III.E of the majority opinion, which affirms the district court's rejection of many of Tammy Brawner's theories of municipal liability. Unlike the majority opinion, however, I would also affirm the district court's judgment in favor of Scott County on Brawner's deliberate indifference claim. And while resolving the issue is unnecessary to the judgment on appeal, I do not believe that *Kingsley v. Hendrickson*'s excessive force holding abrogates the subjective standard for deliberate indifference claims brought by pretrial detainees.

A. At the outset, it bears reminding that no individual defendants remain parties to this case. As a result, all that is left for us to resolve is Brawner's deliberate indifference claim against Scott County. And as that claim fails to overcome settled limitations on municipal liability, we should affirm the judgment for Scott County.

For decades, a municipality's liability under 42 U.S.C. § 1983 has been subject to an ironclad limitation: the alleged constitutional harm must arise from the conduct of the municipality itself via the "execution of" a municipality's official "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). In view of that limitation, Brawner must demonstrate that Scott County's "deliberate conduct" was the "moving force" behind her injury. *Graham ex rel. Estate of Graham v. County of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) (citation omitted). Doing so requires Brawner to establish a "direct causal link" between a Scott County policy and her asserted constitutional injury. *Id.* (citation omitted). On that score, a municipal policy cannot be the "moving force" behind an injury resulting from "factors other than a faulty [County policy]" or "an otherwise sound program [that] has occasionally been negligently administered." *Id.* at 384–85 (quoting *City of Canton v. Harris*, 489 U.S. 378, 390–91 (1989)). These "stringent standards" exist to preserve municipal liability from degrading into "*de facto respondeat superior* liability explicitly prohibited by *Monell*." *Id.* at 383 (citation omitted).

The majority opinion attributes Brawner's asserted injury to Scott County's policy of not allowing a pretrial detainee to access prescription medications before the detainee's physical examination (which, in practice, can occur as late as fourteen days after booking) coupled with the County policy banning controlled substances in the jail. Perhaps there is a setting in which those policies could prove problematic. But Brawner's case is not one of them. For her asserted injury is not directly traceable to either policy. *Morgan v. Fairfield County*, 903 F.3d 553, 566 (6th Cir. 2018). Rather, her injury is tied, at most, to unfortunate missteps by jail medical staff in *failing to follow* County policy, in particular County screening procedures for identifying and addressing a detainee's need for prescribed medications.

On this record, only the booking officer or Nurse Massengale individually could bear responsibility for Brawner's injury. County policy required the booking officer to relay Brawner's statements about her prescribed medications to Massengale, thereby putting Massengale on notice of Brawner's serious medical needs. Adherence to that aspect of County policy was critical because Massengale, as she explained during her testimony, could expedite a detainee's physical examination if screening procedures indicated that a detainee had a serious medical need. That did not happen here, either because Massengale was not notified of Brawner's medications list, or because Massengale had that information yet failed to act on it, as she could have done. Either way, any shortcoming in promptly providing Brawner with her medications or suitable substitutes arose from a failure to follow the County's screening procedures, not from the execution of a County policy itself. *Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 490 (6th Cir. 2020). Massengale's inaction may establish deliberate indifference on her part. But Brawner's claims ultimately turn not on Massengale's indifference, but instead on whether County policies themselves were the "moving force" behind Brawner's injuries. *Garner v. Memphis Police Dep't*, 8 F.3d 358, 365 (6th Cir. 1993) (citation omitted).

Whether the controlled substance ban together with a lengthy examination period ultimately would have combined to prevent Brawner from receiving her medications in a timely manner, as the majority posits, is purely hypothetical. The record below, after all, roots Brawner's injury in the deficient implementation of County policies, not the policies themselves. We addressed a similar circumstance in *Bruederle v. Louisville Metro Government*, 687 F.3d 771

(6th Cir. 2012). As we explained there, even where a county's "no narcotics" policy might hypothetically lead to an inmate being injured, when a jail has no chance to apply that policy or provide other ameliorative drugs to address withdrawal before a plaintiff's seizure, the plaintiff's injury does not "flow[] from the execution" of any official policy. *Id.* at 777 (citation omitted); *see also French v. Daviess County*, 376 F. App'x 519, 523 (6th Cir. 2010) (rejecting a deliberate indifference claim based on a jail's "no Xanax" policy where the prisoner "failed to show that such a policy was unconstitutional as applied to him"). Perhaps, unlike in *Bruederle*, there was "plenty of time" for Brawner to receive her medications. Maj. Op. at 17. *Bruederle*'s holding, however, turned on the injury's cause, not its timing. 687 F.3d at 778 ("[T]here is no evidence to suggest that the failure of the jail to verify Bruederle's prescriptions until [four days after his arrest] was a result of anything more than negligence or mistake on the part of the defendants in administering the screening policies."). Brawner likewise fails to establish a direct causal link between her asserted injury and a County policy.

Tammy Brawner's medical care at the Scott County jail was far from perfect. But for purposes of liability under 42 U.S.C. § 1983, Scott County cannot be held responsible for a deprivation of federal rights that its official policies or customs did not create. On that basis, I would affirm the district court's grant of judgment to Scott County.

B. The majority opinion, I acknowledge, sees things differently. It concludes that Brawner could succeed in showing that Massengale violated Brawner's constitutional right to adequate medical care under the traditional, subjective deliberate indifference standard. *See* Maj. Op. at 8 n.1 ("[A] reasonable jury could conclude that Nurse Massengale knew of the substantial risk of serious harm to Brawner . . . ."). And it concludes that a reasonable jury could tie Massengale's deliberate indifference to a Scott County policy. Maj. Op. at 16–18. That is all that is necessary to remand this case back to the district court, as the majority opinion orders.

Yet the majority opinion also considers Brawner's alternative argument, namely, that her claims could survive for trial under a purely objective test for deliberate indifference. To that end, Brawner would have us graft the legal framework for excessive force claims for pretrial detainees articulated in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), onto deliberate indifference claims asserted by detainees. Every other time a party has asked us to apply the

*Kingsley* framework to deliberate indifference claims, we have rightly acknowledged there was no need to do so when the case could be decided on alternative grounds. *See Griffith v. Franklin County*, 975 F.3d 554, 570 (6th Cir. 2020) (noting that we have generally opted to "stay[] out of the fray" on this contentious, circuit-splitting issue). And those cases are legion. *See, e.g.*, *Bowles v. Bourbon County*, --- F. App'x ---, 2021 WL 3028128, at *8 (6th Cir. July 19, 2021) ("Regardless of whether we analyze Plaintiffs' claims under the objective-unreasonableness standard, . . . or under the more stringent subjective deliberate-indifference standard, Plaintiffs' claims fail . . . . Accordingly, we do not contribute to the circuit split on the relevant test."); *Cameron v. Bouchard*, 815 F. App'x 978, 984–85 (6th Cir. 2020) ("We need not resolve the [*Kingsley*] issue today, because no matter the approach we adopt, the outcome is the same."); *Martin v. Warren County*, 799 F. App'x 329, 337 n.4 (6th Cir. 2020) ("Because [the plaintiff] at best shows negligent conduct when she does not otherwise fail to make a showing of causation, we leave the *Kingsley* question for another day."); *Troutman*, 979 F.3d at 482 n.8 ("Plaintiffs and their amici assert that we should adopt the [*Kingsley*] standard . . . . This case does not present the opportunity to do so . . . ."); *Bard v. Brown County*, 970 F.3d 738, 763 n.16 (6th Cir. 2020) ("We have not yet issued a published opinion interpreting the effect of [*Kingsley*] on deliberate-indifference claims to conditions of confinement in the pretrial-detainee context. But even if we continued to apply a purely subjective standard to these claims, the result here would be the same." (citations omitted)); *Williams v. City of Georgetown*, 774 F. App'x 951, 955 n.2 (6th Cir. 2019) (per curiam) ("The parties note that [*Kingsley*] may have altered this analysis. We need not decide that issue." (citations omitted)).

Exercising judicial modesty, judges across our Court have "reserve[d] the [*Kingsley*] question for another day" when the outcome on appeal would be the same "under either test"—the traditional subjective deliberate indifference standard or *Kingsley*'s objective reasonableness standard. *Griffith*, 975 F.3d at 570 & n.5. We have faithfully done so out of respect for the federal constitution, for which we prize restraint by deferring contentious constitutional questions unless "unavoidable" or "absolutely necessary" to the appeal's disposition. *Id.* (citations omitted); *see also Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (observing that federal courts should not "formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied"

(quoting *Liverpool, N.Y. & Phila. Steam-Ship Co. v. Comm'rs of Emigration*, 113 U.S. 33, 39 (1885))).   That is wise counsel again today, where resolving the *Kingsley* issue is neither "absolutely necessary" to the appeal's outcome nor "unavoidable" in ways not previously faced by many past panels.

We have likewise refrained from addressing *Kingsley*'s purported applicability to deliberate indifference claims in recognition of our established rules governing a decision's holding, as contrasted with dicta that might accompany a holding.  A case's holding is binding on future panels of our Court.  *See, e.g.*, *RLR Invs., LLC v. City of Pigeon Forge*, 4 F.4th 380, 390 n.4 (6th Cir. 2021).  But dicta—that is, anything "not necessary to the determination of the issue on appeal"—is not.  *Freed v. Thomas*, 976 F.3d 729, 738 (6th Cir. 2020) (citation omitted). That latter principle is central to today's case.  When, as here, a party can prevail under both a higher standard and a lower standard, "selecting one standard or the other would 'not [be] necessary to the determination of the issue on appeal.'"  *United States v. Hardin*, 539 F.3d 404, 413 (6th Cir. 2008) (alteration in original) (citation omitted).  For purposes of this appeal, where the question is whether Brawner alleged sufficient evidence to make out a violation of her Fourteenth Amendment rights, "[t]he preference of a particular standard would . . . be dicta."  *Id.* Demonstrating the point, remove mention of *Kingsley* from the majority opinion and its judgment stands unaffected.   *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019) (acknowledging that alternate, independent holdings may exist but reaffirming that "a conclusion that does *nothing* to determine the outcome is dictum and has no binding force").

With these considerations in mind, it is no surprise that we have refused to reach the *Kingsley* question when doing so would be, at most, non-binding dicta.  Today, the majority opinion, noting the district court's comments about instructions the jury never received, suggests that it might be appropriate to resolve the *Kingsley* question because our answer to that question theoretically will be "relevant on remand" and at trial.  Maj. Op. at 8 & n.2.  The same could be said, of course, about a great many other issues as well, given the inherent unpredictability a trial brings.  But because resolving the *Kingsley* question is not essential to support today's judgment, the majority opinion's conclusion on the issue is not today's holding.

As all of this abundantly demonstrates, constitutional avoidance, judicial modesty, past practice, binding precedent, and respect for the role of the district court all confirm why any discussion of *Kingsley* here is unnecessary. That last point bears particular emphasis. The district court, as is the customary practice, can resolve on remand any outstanding issues as needed. That includes the *Kingsley* issue, for which the proper solution is to wait for the issue to be teed up during trial. Using a special verdict form with tailored interrogatories, the trial court can easily deduce whether the prison officials' actions met the objective and/or subjective standards. *See* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2505 (3d ed. 2019) (explaining the broad discretion Federal Rule of Civil Procedure 49 affords district courts to fashion special verdict forms and jury interrogatories). In fact, Brawner has already indicated that she will propose such a verdict form to allow the jury to determine whether she satisfied the objective-only component. *See* R. 207, Trial Transcript, PageID#1335; R. 168, Proposed Jury Instructions. The district court seemingly can add a second question, one that asks whether the County also acted with conventional subjective indifference. If both answers come back in the affirmative, not even the district court will need to resolve the *Kingsley* issue, let alone this Court.

C. Nor do I believe that the majority opinion, even in the capacity of an advisory opinion, articulates the proper reading of *Kingsley*. For when properly presented with the opportunity to extend *Kingsley* in a future case, we should decline that invitation. At best, *Kingsley*'s relinquishment of the subjective inquiry applies only to a pretrial detainee's excessive force claims. It does not extend to claims premised on a failure to act, the essence of a deliberate indifference claim. For that reason, and because *Kingsley* fits comfortably within our existing deliberate indifference jurisprudence, *Kingsley* would be the quintessential stalking horse if invoked as grounds to overrule our current deliberate indifference precedent.

1. Start with the relevant constitutional backdrop. The Eighth Amendment's Prohibitions Clause proscribes the infliction of "cruel and unusual punishments." U.S. CONST. amend. VIII. From that Clause, the Supreme Court has recognized "the government's obligation to provide medical care for those whom it is punishing by incarceration," and a corresponding prohibition on "unnecessary and wanton infliction of pain" caused by the deliberate withholding

of treatment for a "serious" medical need. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). The Eighth Amendment, it bears noting, does not impose liability for "accident[al]" pain caused by the "inadvertent failure to provide adequate medical care," or "negligent . . . diagnosi[s]." *Id.* at 105–06. So while a prison official's negligence does not run afoul of the Eighth Amendment, an official's "deliberate indifference" to one's serious medical needs can give rise to a constitutional cause of action. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991) (citation omitted).

To establish that a prison official acted with deliberate indifference, a prisoner must show two components, one objective and the other subjective. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). That is, the prisoner must show both that the alleged wrongdoing was objectively harmful enough to establish an Eighth Amendment violation, and that the official acted with a culpable enough state of mind. *Id.* at 834–35. The goal of the subjective inquiry is to separate cruel and unusual "punishments," which are forbidden by the Eighth Amendment, from cruel and unusual "conditions," which are not. *Id.* at 837. The subjective inquiry into the defendant's state of mind "isolates those who inflict punishment" within the meaning of the Eighth Amendment. *Id.* at 839; *see also Rhinehart v. Scutt*, 894 F.3d 721, 736–37 (6th Cir. 2018) (explaining that the original public meaning of the term "punishment" in the Eighth Amendment required some degree of punitive intent from the punisher).

As mentioned, beginning with *Estelle* and *Farmer*, the federal courts have derived an Eighth Amendment-based deliberate indifference cause of action in the context of prisoners—those who have been convicted and sentenced. *Estelle*, 429 U.S. at 102–06; *Farmer*, 511 U.S. at 835. Invoking that precedent, we extended those same protections to pretrial detainees—those awaiting trial without an adjudication of guilt—under the umbrella of the Fourteenth Amendment's Due Process Clause. *Roberts v. City of Troy*, 773 F.2d 720, 724–25 (6th Cir. 1985). That dichotomy is the result of the constitutional paradigm that while prisoners cannot be punished cruelly or unusually, U.S. CONST. amend. VIII, pretrial detainees cannot be punished at all prior to an adjudication of guilt in accordance with due process of law, U.S. CONST. amend. XIV. *See Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). Accordingly, the "proper inquiry" for evaluating the conditions of confinement for a pretrial detainee is "whether those conditions amount to punishment." *Bell v. Wolfish,* 441 U.S. 520, 535 (1979).

Notwithstanding the differing constitutional protections afforded prisoners and pretrial detainees, we have long treated the respective groups identically when assessing the subjective component of deliberate indifference claims. *See, e.g.*, *Richmond v. Huq*, 885 F.3d 928, 937 (6th Cir. 2018). We have utilized that uniform approach because the subjective aspect of the deliberate indifference test serves an identical purpose in both contexts: it helps delineate whether a failure to provide adequate medical care (to either a prisoner or pretrial detainee) occurred merely due to an official's negligence or, instead, due to an intentional act, thereby constituting unconstitutional "punishment." *See Griffith*, 975 F.3d at 569 (citing *Roberts*, 773 F.2d at 724–25). Because "the punitive intent required under [*Bell*] is the same 'punishment' governed by the Eighth Amendment," we employ the same deliberate indifference test for pretrial detainees under the Fourteenth Amendment. *Id.* Put another way, though the nature of the underlying constitutional right differs, the subjective inquiry serves an identical purpose in both contexts: it "isolates those who inflict punishment." *Farmer*, 511 U.S. at 839.

2. *Kingsley* did not alter this settled framework. *Kingsley* reversed the precedent of those circuits that imposed a subjective standard for excessive force claims brought by pretrial detainees against prison officials. 576 U.S. at 395. Invoking *Bell*'s reading of the Fourteenth Amendment as prohibiting any "punishment" of a pretrial detainee, a divided Supreme Court held that a subjective component does not apply to excessive force claims brought by pretrial detainees, meaning a court need not consider the officer's reasons for using force or whether the officer believed the force used was excessive. *Id.* at 398. Accordingly, even absent an expressed intent to punish, objectively unreasonable force amounts to punishment because it could not be "rationally related to a legitimate nonpunitive governmental purpose," and thus would "appear excessive in relation to that purpose." *Id.* (quoting *Bell*, 441 U.S. at 561).

But it is difficult to see how *Kingsley*'s holding as to excessive force abrogates the subjective component of our Fourteenth Amendment deliberate indifference standard. For starters, nothing in *Kingsley* purports to address, let alone modify, deliberate indifference standards. *Kingsley* reached only the narrow question of the standard for determining "whether the force deliberately used is, constitutionally speaking, 'excessive.'" *Id.* at 396. "It is with respect to *this*" issue, *Kingsley* explained, that "courts must use an objective standard." *Id.* Case

in point, *Kingsley* cited only excessive force cases.  It made no mention of *Farmer*, the genesis of the subjective deliberate indifference standard.  And it took pains to emphasize the limited scope of its ruling, acknowledging, for example, that "our view that an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment may raise questions about the use of a subjective standard in the context of excessive force claims brought by convicted prisoners," yet declining to resolve even that latter issue, let alone issues regarding an entirely different theory of recovery.  *Id.* at 402.

Against this settled backdrop, it would be peculiar to seize on *Kingsley*'s general pronouncements as to excessive force claims as a basis for rewriting our deliberate indifference jurisprudence.  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 n.5 (1992) ("It is of course contrary to all traditions of our jurisprudence to consider the law on this point conclusively resolved by broad language in cases where the issue was not presented or even envisioned.").  *Kingsley* is not "an inconsistent decision of the United States Supreme Court" that would authorize a panel of our Court to "overrule the decision of another panel." *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985).  Neither the language nor logic of *Kingsley* suggests a broader application beyond the excessive force setting, a fact recognized by other circuits that wisely have refused to chart the majority opinion's proposed course.  *Strain v. Regalado*, 977 F.3d 984, 991 (10th Cir. 2020) ("Although [*Kingsley*] did not foreclose the possibility of extending the purely objective standard to new contexts, the Court said nothing to suggest it intended to extend that standard to pretrial detainee claims generally or deliberate indifference claims specifically."); *Whitney v. City of St. Louis*, 887 F.3d 857, 860 n.4 (8th Cir. 2018) ("*Kingsley* does not control because it was an excessive force case, not a deliberate indifference case."); *Dang ex rel. Dang v. Sheriff, Seminole Cnty.*, 871 F.3d 1272, 1279 n.2 (11th Cir. 2017) ("*Kingsley* involved an excessive-force claim, not a claim of inadequate medical treatment due to deliberate indifference . . . . [I]t does not actually abrogate or directly conflict with our prior precedent.") (internal quotation marks and citations omitted); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 420 (5th Cir. 2017) (per curiam) (declining to extend *Kingsley* where "the Fifth Circuit has continued to . . . apply a subjective [deliberate indifference] standard post-*Kingsley*").

To be sure, as the majority opinion notes, *Kingsley* acknowledges a "clear delineation" between prisoners (who are subject to punishments) and pretrial detainees (who are not). Maj. Op. at 13. Yet even then, employing a subjective standard for deliberate indifference claims is entirely consistent with *Kingsley*. For *Kingsley* turned as much or more on the nature of the claim as it did on the status of the held individual. Nor was *Kingsley* the first time in which the Supreme Court explored the dichotomy between detainees and prisoners. That understanding far predates *Kingsley*. *See Bell*, 441 U.S. at 535–36 & n.16, *Whitley v. Albers*, 475 U.S. 312, 318–19 (1986); *Ingraham*, 430 U.S. at 670–71 & n.40; *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 165–67 (1963); *Wong Wing v. United States*, 163 U.S. 228, 237 (1896). And our Court, it bears noting, has already reconciled the differing statuses of prisoners and pretrial detainees for purposes of deliberate indifference claims. As we explained in *Roberts*, it is "appropriate" to apply the same Eighth Amendment subjective standard to pretrial detainees because that standard yields identical results to the "punishment" standard articulated in *Bell*. *See Griffith*, 975 F.3d at 569 (citing *Roberts*, 773 F.2d at 724–25). All this to say that *Kingsley*'s "delineation" between prisoners and pretrial detainees, which is not a new concept, surely does not compel a sea change in our *Farmer*-inspired deliberate indifference jurisprudence.

Nor is *Kingsley*'s reasoning at odds with our settled traditional deliberate indifference jurisprudence. *Kingsley* reaffirmed twin assumptions underpinning our longstanding deliberate indifference jurisprudence: that "liability for *negligently* inflicted harm is categorically beneath the threshold of constitutional due process," 576 U.S. at 396 (internal quotation marks and citation omitted), and that "pretrial detainees (unlike convicted prisoners) cannot be punished at all," *id.* at 400. And it went on to emphasize the difference between intentional infliction of punishment, for example "the swing of a fist that hits a face, a push that leads to a fall, or the shot of a Taser that leads to the stunning of its recipient," *id.* at 395, and an accidental harm, for instance where "an officer's Taser goes off by accident" or "an officer unintentionally trips and falls on a detainee, causing him harm," *id.* at 396. Taking as given that the facts of the underlying excessive force claim did not implicate negligence, *id.*, *Kingsley*'s holding, derived from *Bell*, observed that when a detainee shows deliberate acts to be "excessive in relation" to any "legitimate governmental objective," a court may infer that those acts are punitive in nature "without proof of intent (or motive) to punish," *id.* at 398. For it is the unique case in which an

officer harms a prisoner with objectively excessive force but nonpunitive intent. Accordingly, excessive force claims are measured by asking whether the "facts and circumstances of each particular case" demonstrate objectively unreasonable actions, without considering the actor's subjective motivations. *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The same cannot be said for claims premised on a failure to provide adequate medical care. "[T]he two categories of claims protect different rights for different purposes," and thus "require different state-of-mind inquiries." *Strain*, 977 F.3d at 991 (rejecting the suggestion that *Kingsley* displaced the Tenth Circuit's subjective standard for Fourteenth Amendment deliberate indifference claims). With respect to affirmative acts that amount to excessive force, punitive intent customarily may be inferred without defaulting to subjective considerations. But the same inference does not arise from the deprivation of adequate medical care, which often rests on an unwitting failure to act, making one's subjective intent critical in understanding the chain of events. As Judge Ikuta has persuasively explained, a prison official's mindset is likely obvious when the official brutally beats a detainee. But the same is not true when that same official merely "fails to act" in response to a detainee's medical needs:

> As explained in *Bell*, in analyzing a pretrial detainee's Fourteenth Amendment claim, the key question is whether the situation at issue amounts to a punishment of the detainee. While punitive intent may be inferred from affirmative acts that are excessive in relationship to a legitimate government objective, the mere failure to act does not raise the same inference. Rather, a person who unknowingly fails to act—even when such a failure is objectively unreasonable—is negligent at most. And the Supreme Court has made clear that liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.

*Castro v. County of Los Angeles*, 833 F.3d 1060, 1086 (9th Cir. 2016) (en banc) (Ikuta, J., dissenting) (internal quotation marks and citations omitted). Indeed, by its very definition, a deliberate indifference claim requires some appreciation for the consequences of one's actions, and thus consideration of one's subjective intent. *Strain*, 977 F.3d at 987 ("[T]he word deliberate makes a subjective component inherent in the claim."). Without any manner of inquiry into a party's intent, courts cannot fairly distinguish negligent deprivation of care—which does not give rise to a constitutional claim—from an intentional deprivation of care that amounts to punishment—which violates the Fourteenth Amendment.

3. How does the majority opinion purport to grapple with this distinction?  It would erect a novel third standard—"something akin to reckless disregard."  Maj. Op. at 13 (quoting *Castro*, 833 F.3d at 1071).  That standard, according to the majority opinion, purportedly is lower than our subjective Eighth Amendment deliberate indifference standard, yet higher than the negligence standard that *Kingsley* reaffirmed is out of bounds for any Fourteenth Amendment claim.

Oddly enough, having used *Kingsley* as a springboard to jettison our settled deliberate indifference jurisprudence, the majority opinion then urges an approach that is unfaithful to *Kingsley*.  That is evident in at least three respects.  One, *Kingsley*'s central question and the majority opinion's central questions are misaligned.  *Kingsley* applied an objective lens to "the defendant's state of mind with respect to the proper *interpretation* of the force . . . that the defendant deliberately (not accidentally or negligently) used."  576 U.S. at 396.  In other words, *Kingsley* instructs courts to disregard whether the officer believed the force she deliberately used was excessive.  But following the majority opinion's logic here, in assessing whether a prison official acted unreasonably in failing to provide medical care "in the face of an unjustifiably high risk of harm," the inquiry becomes whether that prison official *appreciated the risks* associated with a deliberate *failure to act*.  Maj. Op. at 13.  In other words, did the officer believe substantial harm could occur if the officer failed to act?  Two, *Kingsley* assumed as given that an objective inquiry would apply only to "deliberate—i.e., purposeful or knowing" uses of force.  576 U.S. at 396.  *Kingsley* did not purport to extend its holding into the domain of recklessness. *Id.* ("Whether that [recklessness] standard might suffice for liability in the case of an alleged mistreatment of a pretrial detainee need not be decided here.").  Yet that is what the majority opinion would do by asking whether an official "recklessly failed to act" to address a serious medical need from the perspective of a reasonable official in her position.  Maj. Op. at 13 (quoting *Griffith*, 975 F.3d at 589 (Clay, J., concurring in part and dissenting in part)).  And three, trying to determine whether an official failed to act reasonably under the circumstances is tantamount to determining whether that official was negligent—a theory that *Kingsley* made clear still falls "beneath the threshold of constitutional due process."  576 U.S. at 396 (citation omitted).  At bottom, *Kingsley*'s test (which applies to affirmative acts) is irreconcilable with the majority opinion's test (which applies to failures to act), a tension other courts have

acknowledged in criticizing this "entirely new standard of constitutional liability:   reckless indifference." *Terry v. County of Milwaukee*, 357 F. Supp. 3d 732, 745 (E.D. Wis. 2019).  When the *Kingsley* issue is properly presented in a future case, our Court should forgo following this unmerited and unwise path.

*          *          *          *          *

Curiously, the majority opinion may be fonder of the standard it purports to reject than meets the eye.  To separate accidental or negligent acts from deliberate acts (the stated purpose of *Kingsley* itself), the majority opinion suggests that an officer has acted objectively unreasonably with respect to a detainee's serious medical needs if the officer acted "intentionally to ignore" or "recklessly failed to act with reasonable care to mitigate" a serious medical risk of which a "reasonable official in the defendant's position would have known, or should have known." Maj. Op. at 13–14 (citing *Griffith*, 975 F.3d at 589 (Clay, J., concurring in part and dissenting in part)).  Yet in terms of the proof necessary to make out such a claim, it is not entirely clear how this objective reasonableness standard differs from our traditional subjective indifference standard.  Rightly or wrongly, we seemingly already allow jurors to conclude that an officer satisfies the subjective component whenever a plaintiff pleads facts sufficient to suggest a "conscious disregard" for a pretrial detainee's substantial health risk.  *See, e.g.*, *LeMarbe v. Wisneski*, 266 F.3d 429, 440 (6th Cir. 2001).  And "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Rouster v. County of Saginaw*, 749 F.3d 437, 447 (6th Cir. 2014) (quoting *Farmer*, 511 U.S. at 842).  In failing to articulate a true point of departure from our conventional *Farmer* test, the majority opinion arguably "has simply dressed up the *Farmer* test in *Kingsley* language for no apparent reason[,] . . . conflat[ing] the two standards only to end up where we started." *Castro*, 833 F.3d at 1087 (Ikuta, J., dissenting); *cf. Griffith*, 975 F.3d at 589 (Clay, J., concurring in part and dissenting in part) (characterizing *Kingsley*'s potential effect on the deliberate indifference standard as a "slight adjustment to the nomenclature we use in deliberate indifference cases"). That test, if adopted, may well yield results largely the same as the conventional subjective test it purports to overrule.

So, to recap, the majority opinion reads *Kingsley*'s excessive force holding as a basis for rewriting our traditional standard for a different claim—deliberate indifference. Yet it then crafts a legal standard for objective indifference that fails to track the test articulated in *Kingsley* (and, in so doing, prefers a novel and seemingly unusual "reckless indifference" standard). And it does all of this only to foster a standard that, in practice, looks more and more like the standard the majority opinion is so eager to abandon. If this winding jurisprudential path has left you feeling a bit lost, you are not alone.

There is a better way. I remain unconvinced that the Fourteenth Amendment confers any freestanding right to be free from jailhouse medical malpractice. *See J.H. v. Williamson County*, 951 F.3d 709, 726 (6th Cir. 2020) (Readler, J., concurring) ("[S]ubstantive due process does not tie the hands of public officials in weighing the many considerations before them as they resolve a difficult episode."); *cf. Rhodes v. Michigan*, --- F.4th ----, 2021 WL 3730698, at *13 (6th Cir. Aug. 24, 2021) (Thapar, J., dissenting) (observing that the original meaning of the Eighth Amendment counsels against it being "a glorified tort statute" or a "National Code of Prison Regulation"). But that does not mean that detainees who suffer harm at the hands of incompetent officers have no means for legal redress. For "our Constitution is not the only source of American law." *Kingsley*, 576 U.S. at 408 (Scalia, J., dissenting). Rather than taking further steps to "tortify the Fourteenth Amendment," *id.*, contorted in this case even more than usual, pretrial detainees like Brawner can draw on a rich body of state negligence law for recompense. *See Paul v. Davis*, 424 U.S. 693, 701 (1976) (warning of the "constitutional shoals" that "confront any attempt to derive from congressional civil rights statutes a body of general tort law"); *Rhodes*, 2021 WL 3730698, at *13 (Thapar, J., dissenting) ("[W]e have state tort law . . . so that people can recover for the injuries they suffer at someone else's hand . . . . [S]tatus as an inmate [does not] entitle[] [one] to special rights."). That field of law, after all, is a traditional area of focus for state legislatures and state courts. I would not further expand the Fourteenth Amendment to swallow up matters better left to those able bodies.