NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0490n.06
Filed: August 13, 2008

No. 07-2122

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

RODNEY MABRY, )
)
    *Plaintiff-Appellant*, )
)
*v.* )
)
ARTURO ANTONINI, et al., )
)
    *Defendants-Appellees*. )

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

**O P I N I O N**

BEFORE:    COLE and CLAY, Circuit Judges; RUSSELL, District Judge[*]

**COLE, Circuit Judge.** Plaintiff-Appellant Rodney Mabry, a former inmate in the Michigan Department of Corrections ("MDOC"), filed this claim under 42 U.S.C. § 1983 against Defendants-Appellees Dr. Arturo Antonini and Dr. Rocco DeMasi, alleging they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. At issue in this case is whether the district court properly granted Dr. Antonini and Dr. DeMasi's motions for summary judgment. Because we conclude that Mabry has failed to show a genuine issue of material fact as to his claimed Eighth Amendment violation, we **AFFIRM** the judgment of the district court.

## I. BACKGROUND

---

[*] The Honorable Thomas B. Russell, United States District Judge for the Western District of Kentucky, sitting by designation.

This case involves Rodney Mabry's medical treatment while an inmate at the Carson City Correctional Facility in Carson City, Michigan. In April 2002, then-23-year-old Mabry began a twenty-year sentence for the possession with intent to distribute illegal narcotics. At the time he began his sentence, Mabry had no diagnosed neurological problems, though he had a history of seizures during his childhood.

Those seizures began to resurface while in prison. In May 2002, Mabry experienced his first bout with "blurred vision, dizziness," and an inability "to keep [his] balance," which ended with him blacking out and waking "up on the ground." (Joint Appendix ("JA") 93-94.) Prison officials treated him with Dilantin and Depakote, anti-seizure medication, which appeared to work until February 18, 2003, when Mabry fell again, hit his head, and was taken to the hospital.

This episode marked the beginning of Mabry's deteriorating medical condition. Over the next two months, Mabry experienced extreme migraines and dizziness, which ended in hospital visits on both March 4 and 6, 2003. Dr. Daniel Freeman, a neurologist, examined Mabry at this time and diagnosed him with herpetic meningeoncephalitis, an inflammatory disease of the membranes surrounding the brain and spinal cord, caused by the herpes virus. Mabry's allegations center

around the failure of the defendants to diagnose his real condition—neurosarcoidosis[1]—after these trips to the hospital.

The following presents a basic time-line of his treatment during these few months. On April 4, Mabry first saw Defendant-Appellant Dr. Antonini, a contract doctor with the Correctional Medical Services, Inc. ("CMS"), an independent medical services provider for the MDOC. At this appointment, Dr. Antonini performed a complete examination, and noted that Mabry's seizures and herpes were under control, but that Mabry suffered from hypertension. Both the X-ray and the neurological portion of the exam showed normal functioning, which in Dr. Antonini's view, ruled out an earlier diagnosis of neurosarcoidosis. Three days later, Dr. Freeman performed an additional neurological examination and offered the same diagnosis as before, herpetic meningeoncephalitis, and asked Mabry to schedule a follow-up exam in two months.

---

[1] The National Institute of Neurological Disorders and Stroke provides the following explanation of neurosarcoidosis:

Neurosarcoidosis is a serious and devastating manifestation of sarcoidosis in the nervous system. Sarcoidosis is a chronic inflammatory disorder that typically occurs in adults between 20 and 40 years of age and primarily affects the lungs, but can also impact almost every other organ and system in the body. Neurosarcoidosis is characterized by inflammation and abnormal cell deposits in any part of the nervous system – the brain, spinal cord, or peripheral nerves. It most commonly occurs in the cranial and facial nerves, the hypothalamus (a specific area of the brain), and the pituitary gland. It is estimated to develop in 5 to 15 percent of those individuals who have sarcoidosis. Weakness of the facial muscles on one side of the face (Bell's palsy) is a common symptom of neurosarcoidosis. The optic and auditory nerves can also become involved, causing vision and hearing impairments. It can cause headache, seizures, memory loss, hallucinations, irritability, agitation, and changes in mood and behavior. Neurosarcoidosis can appear in an acute, explosive fashion or start as a slow chronic illness. Because neurosarcoidosis manifests in many different ways, a diagnosis may be difficult and delayed.

N I N D S   N e u r o s a r c o i d o s i s   I n f o r m a t i o n   P a g e ,   *a v a i l a b l e   a t* http://www.ninds.nih.gov/disorders/neurosarcoidosis/neurosarcoidosis.htm.

When Mabry complained of similar symptoms shortly thereafter—namely, blurred vision, migraines, and vertigo—Dr. Antonini again examined Mabry and requested a neurological follow-up with Dr. Freeman. Defendant-Appellant Dr. DeMasi, the Regional Medical Director for Utilization Management of CMS, approved this consult and scheduled an appointment for May 5.

Mabry did not receive the neurological follow-up with Dr. Freeman until June 2. The report following this exam opined that "[t]he dizziness is probably the residual of meningeoncephalitis," the same diagnosis Dr. Freeman offered before. (JA 173.) "Given the unusual nature of th[e] case," Dr. Freeman ordered a MRI scan of his brain "to make sure there is not a developing lesion such as an abscess." (*Id.*) On June 6, Dr. Antonini received this request and immediately filled out a form for a MRI, a possible spinal tap, and a follow-up with Dr. Freeman in a month. Shortly thereafter, Dr. DeMasi approved the request for a MRI, while delaying the request for a neurological consultation in order to first obtain the MRI results.

Only two days later, on June 8, Mabry once again complained of dizziness and blurred vision. Mabry was taken to the hospital, where the attending physician performed a CT scan and urinalysis, which all came back at normal levels. When Mabry next saw Dr. Antonini three days later, Dr. Antonini noted that Mabry exhibited the same symptoms, but attributed his symptoms to his high blood pressure and recovery from encephalitis.

Mabry finally had his MRI on July 17. The report that followed noted "marked improvement of the previously identified parenchymal abnormalities," "resolution of a majority of the signal changes involving the cerebral hemispheres," and "no evidence of mass or abscess." (JA 171.) When Dr. Antonini received the results of Mabry's MRI, he renewed his request for a neurological

consultation, despite the fact that Mabry's condition had improved. Eight days later, however, Dr. DeMasi decided not to authorize the follow-up exam because the MRI did not reveal an abscess.

Dr. Antonini examined Mabry twice more in August. After the second examination, Dr. Antonini decided to appeal Dr. DeMasi's earlier denial of a neurological exam, and telephoned CMS directly to obtain a verbal authorization for the neurological consult. Upon receiving this appeal, Dr. DeMasi immediately reversed his earlier decision and authorized the exam.

Unbeknownst to Dr. DeMasi or Dr. Antonini, Dr. Freeman, the neurologist who had earlier seen Mabry, had taken sick leave and was unavailable to provide a neurological consultation. CMS notified Dr. Antonini that it had approved the exam, but that "doctors have not been confirmed for appointments in the time frame of your request, and therefore, approvals for clinic visits are being faxed back without an appointment date." (JA 315.)

On October 7, Dr. Antonini examined Mabry once again and found that he "continues with progressive weakness with unsteady balance," making Mabry wheelchair-dependent. He recommended that Mabry's blood-pressure medication be reevaluated and that he undergo an EKG exam and follow-up in one week. Realizing that Mabry had still yet to receive his neurological examination, Dr. Antonini called CMS once again to recommend an evaluation by a University of Michigan neurologist as soon as possible.

Mabry saw Dr. Antonini for the last time on October 22, complaining of hearing problems in his left ear. Aside from the ear issue, Mabry expressed that he was doing "ok," that he was taking all medications as prescribed without side effects, and that he was eating well. Dr. Antonini ordered

an ear-irrigation to clear some blockage and recommended that he continue his follow-ups, but Mabry never returned.

Finally, on December 29, and only a few days before his parole, Mabry received a neurological follow-up examination. Dr. Umesh Verma conducted a complete exam and found that Mabry had weakness in his right leg, left leg, and left foot, hyperreflexia, and an ataxic gait. He recommended that Mabry obtain a MRI of his brain and spine. During this visit, Mabry told Dr. Verma that he did not want to continue treatment within the prison system because of his pending parole.

The MDOC released Mabry on January 4, 2004. One month later, after a complete examination, doctors suggested a variety of different possibilities for his condition: herpes, neoplasm, a tumor, brain abscess, an infection, chronic meningitis, tuberculosis, or HIV. An MRI showed "infectious, inflammatory and granulomatous [were] considered most likely," but that "the exact etiology is uncertain." (JA 368, 370.) Only after assessing the multiple different tests did doctors suspect neurosarcoidosis.

On May 5, 2006, Mabry filed the instant action under 42 U.S.C. § 1983 in the United States District Court for the Eastern District of Michigan, alleging that Drs. Freeman, Antonini, Verma, DeMasi, and Craig Hutchinson were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment. The district court granted the defendants' motions for summary judgment, *Mabry v. Freeman*, No. 2:06-CV-12076, 2007 WL 2332392 (E.D. Mich. Aug. 15, 2007),

and Mabry timely appealed.[1]  We review de novo a district court's grant of summary judgment.

*Miller v. Admin. Office of the Courts*, 448 F.3d 887, 893 (6th Cir. 2006).

## II.  ANALYSIS

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed

favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United

States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*,

437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)).  For the failure to

provide medical treatment to constitute such a constitutional violation, Mabry must show that the

defendants acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429

U.S. 97, 104 (1976).

A constitutional claim for deliberate indifference contains objective and subjective

components.  The objective component requires a plaintiff to show the existence of a "sufficiently

serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).  The subjective component,

in contrast, requires a plaintiff to "allege facts which, if true, would show that the official being sued

subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact

draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703

(6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).

Both parties and the district court have focused on the subjective component—whether the

two doctors subjectively perceived a substantial risk to Mabry and then disregarded that risk—so we

---

[1]  The district court granted Dr. Freeman's, Dr. Verma's, and Dr. Hutchinson's motions for summary judgment. *Mabry*, 2007 WL 2332392, at *9-10.  Before this appeal, Mabry filed a motion to dismiss those defendants, which the court granted.

will do the same. The central question on appeal is: Did Dr. Antonini or Dr. DeMasi subjectively perceive that the failure to obtain a neurological exam presented a substantial risk to Mabry, but then disregard that risk?

**A. Dr. Antonini**

Mabry contends that Dr. Antonini failed to diagnose Mabry with neurosarcoidosis, to provide adequate medical care, and to treat Mabry's need to see a neurologist as an emergency. "If Dr. Antonini had considered [his] condition more seriously," Mabry alleges, "if he had rushed to get [him] the neurological appointment that was consistently discussed or even labeled the deteriorating physical condition an emergency, then [he] would not have lost the use of his legs." (Appellant's Br. 27.)

The record lends no support to the claim that Dr. Antonini disregarded Mabry's medical conditions. Quite to the contrary, between April and October 2003, Dr. Antonini aggressively treated Mabry and made repeated requests for the appropriate neurological tests.

The record shows that on April 4, 2003, at Mabry's very first appointment, Dr. Antonini performed a complete examination, at which time Dr. Antonini conducted a total of ten different tests, including a basic history and physical examination, blood work, chest x-rays, and an EKG to check for any abnormalities in his heart. On April 22, when Mabry complained of the same symptoms, Dr. Antonini filled out his first request for a neurological examination, which was originally scheduled for May 5. But when Dr. Antonini noticed that Mabry's neurological evaluation never took place, he requested that the appointment be rescheduled.

After Mabry finally received a neurological evaluation, which diagnosed his symptoms as "the residual of meningeoncephalitis," Dr. Freeman, the attending neurologist, ordered a MRI of his brain "to make sure there is not a developing lesion such as an abscess." (JA 171.) Immediately after receiving Dr. Freeman's request for a MRI, Dr. Antonini filled out the appropriate form requesting that the test be done.

Mabry's MRI on July 17 showed that Mabry's condition had dramatically improved. But instead of accepting the improved results and sending Mabry on his way, Dr. Antonini renewed his request for a neurological consultation. Dr. DeMasi, however, denied this request because the MRI did not reveal an abscess. For Mabry's part, there does not seem to be any complaint that Dr. Antonini's actions up to this point were constitutionally deficient in any manner.

Mabry's claims center around Dr. Antonini's failure to pursue aggressively a second neurological consult after Dr. DeMasi denied this initial request. The record, however, shows otherwise. Concerned about Mabry's condition, Dr. Antonini appealed Dr. DeMasi's earlier refusal to administer a neurological examination, and described Mabry's condition as "[p]rogressively deteriorating in balance. Now with ataxia also. Slow mentation getting worse. Activities of daily life affected. Wheelchair dependent. Urgent please." (JA 275.) He also telephoned CMS directly —going above and beyond the standard procedure—to obtain a verbal authorization for the neurological consult. On October 7, realizing that Mabry had yet to receive his neurological examination, Dr. Antonini called CMS, *once again*, to recommend an evaluation by a University of Michigan neurologist.

Unbeknownst to Dr. Antonini, Dr. Freeman, the neurologist who had earlier seen Mabry, was unavailable to provide the neurological consultation. CMS notified Dr. Antonini that it had approved the subsequent exam, but that "doctors have not been confirmed for appointments in the time frame of your request, and therefore, approvals for clinic visits are being faxed back without an appointment date." (JA 315.) Indeed, as the district court observed, "this problem appears to be systematic [sic] and not attributable to Dr. Antonini." *Mabry*, 2007 WL 2332392, at *8.

True, deliberate indifference may be evident when prison officials erect arbitrary and burdensome procedures that "result[ ] in interminable delays and outright denials of medical care to suffering inmates." *Todaro v. Ward*, 565 F.2d 48, 53 (2d Cir. 1977). But the parties do not dispute that Dr. Antonini had no control over when appointments would be scheduled. In fact, even after CMS approved his request, Dr. Antonini continued his efforts to get Mabry an appointment rather than simply relying on CMS's assurances. In short, he did all he could. *See Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991) (holding that liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others").

So in sum, even if we assume that Dr. Antonini knew that the failure to obtain a neurological exam presented a substantial risk to Mabry, Dr. Antonini did not disregard that risk. But we also take issue with that first assumption—that Dr. Antonini knew that the failure to obtain an exam presented a *substantial* risk to Mabry.

Mabry places a significant amount of emphasis on the fact that Dr. Antonini described Mabry's condition as "urgent" yet decided not to put Mabry in emergency care. But there is nothing

in the record to support his belief that his condition required an emergency room visit. In fact, Dr. Antonini testified that Mabry's "was a different case . . . where everything comes out normal and he continues complaining of the same things." (JA 264.) And when asked whether he had ever treated a patient for neurosarcoidosis, Dr. Antonini testified: "No; no. And I will add — would like to add that it is a . . . rare condition, difficult condition. . . . And not only that, usually [it] is not a condition that will get you in a wheelchair, meaning that it will not cripple you or get you crippled. Plus, more than half of the cases or 66 percent of the cases, they are referred on the books that they improve by itself even if not treated." (JA 282.)

Dr. Beatrice C. Engstrand, Mabry's expert witness, did opine that " if Mr. Mabry had been diagnosed with neurosarcoid on or about June 2003, it is more probable than not he would have made a significant recovery." (JA 629.) We agree that this testimony satisfies the objective prong of deliberate indifference—whether Mabry showed the existence of a "sufficiently serious" medical need. *Farmer*, 511 U.S. at 834. But it does not show that Dr. Antonini "subjectively perceived facts from which to infer substantial risk to the prisoner [and] that he did in fact draw the inference." *Comstock*, 273 F.3d at 703. Instead, the record, including all the testimony, points to the fact that Dr. Antonini, despite rigorous treatment, did not know neurosarcoidosis was causing Mabry's symptoms.

Nor can it be said here that "a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005). In *Estate of Carter*, prison officials failed to help an inmate even after they were directly informed of the inmate's immediate distress and chest pains, that she had not

taken heart medication, and that she needed to go to the hospital. *Id.* (citing *Garretson v. City of Madison Heights*, 407 F.3d 789, 798 (6th Cir. 2005), which held that when an inmate was a diabetic in need of insulin, and was past due for her next dose, a genuine issue of material fact existed as to whether prison officials acted with deliberate indifference by failing to have her transported to the hospital). But *Estate of Carter* and *Garretson* concern immediate threats to an inmate's life—e.g., a heart attack or diabetic shock—and not the chronic symptoms about which Mabry complained.

Mabry's case is nearly identical to *Estelle v. Gamble*, 429 U.S. 97 (1976). In *Estelle*, a pro se prisoner filed a complaint against various prison officials, alleging that medical personnel were deliberately indifferent by failing to use additional diagnostic techniques in treating his back pain. *Id.* at 107. Prison officials had seen the plaintiff on seventeen occasions spanning a three month period, ultimately recommending bed rest, muscle relaxants, and pain relievers as treatment. *Id.* In response to the plaintiff's contention that the doctors should have done more by the way of diagnosis and treatment, including an X-ray, the Supreme Court held that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Id.* at 106. As it was in *Estelle*, so it is here: Mabry's claim against Dr. Antonini is merely a complaint that he did not order specific tests, or provide specific medications, treatment, or dosages. Such an assertion does not state a constitutional claim of deliberate indifference as to serious medical needs.

Nor do the cases that Mabry relies on help him. In *Brooks v. Celeste*, 39 F.3d 125 (6th Cir. 1994), we held that "repeated acts of negligence" may "help[] prove that *each act* was committed with deliberate indifference." *Id.* at 128. True. But the *Brooks* Court rejected what Mabry

assumes—that the showing of repeated acts of negligence would *suffice* to establish deliberate indifference. *Id.* And as we have already explained, Dr. Antonini's actions, viewed either in isolation or under the totality of the circumstances, cannot meet this constitutional standard.

*Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834 (6th Cir. 2002), does not change our analysis. In *Terrance*, the father of an involuntarily committed mental patient who died at a state psychiatric hospital brought a § 1983 action against hospital personnel, alleging deliberate indifference to medical needs when they allowed the patient to die from heat stroke. The patient suffered from hypertension and a heart condition with abnormal EKG readings. The defendants, despite having knowledge of the patient's condition, prescribed medication which placed him at an increased risk for heat stroke, then allowed the patient to go outdoors and over-exert himself on an extremely hot day. *Id.* at 844-46. In denying summary judgment to three of the defendants, the Court observed that "'[w]hen the need for treatment is obvious, medical care which is so cursory as to amount to no treatment at all may amount to deliberate indifference.'" *Id.* at 843 (quoting *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989)). But there are significant differences between *Terrance* and the instant case. For one, the Court relied on the fact that one of the defendants failed to follow hospital protocols. *Id.* at 844. For another, the defendants did not respond to the patient's heat stroke until one hour after the hospital staff reported it. *Id.* at 844-45. In contrast to the officials in *Terrance*, Dr. Antonini's actions show an active effort to treat Mabry's condition through medical treatment and judgment. In short, Mabry has not shown a genuine issue of material fact as to how Dr. Antonini knew that the delay in obtaining a neurological evaluation presented a substantial risk to Mabry, yet disregarded that risk.

**B. Dr. DeMasi**

Dr. DeMasi was only involved with Mabry on four occasions, concerning approval of off-site consultations or testing. First, on April 24, Dr. DeMasi reviewed a request from Dr. Antonini for a neurological consultation. Dr. DeMasi approved this request. Second, on June 17, Dr. DeMasi reviewed a similar request from Dr. Antonini for a brain MRI, a neurological follow-up, and a possible spinal tap. Dr. DeMasi approved the MRI request, but delayed the follow-up to await the results of the MRI. Third, on July 29, after Mabry's MRI, Dr. DeMasi received a recommendation from Dr. Antonini that Mabry should be reevaluated by a neurologist. Dr. DeMasi denied this request because of the favorable MRI. Finally, Dr. DeMasi received a notice approximately a month later from Dr. Antonini renewing this request. Dr. DeMasi immediately authorized this final request.

Mabry's case against Dr. DeMasi appears to be based on a single action: Dr. DeMasi's decision not to authorize the follow-up neurological exam. But Dr. DeMasi's decision to postpone the follow-up was based on a favorable MRI report, which showed "marked improvement of the previously identified parenchymal abnormalities," "resolution of a majority of the signal changes involving the cerebral hemispheres," and "no evidence of mass or abscess." (JA 171.) Putting this report in context with his clinical evaluation where Mabry showed improvement, Dr. DeMasi made a decision, based on his medical judgment, that a further neurology consultation was unnecessary. When Dr. Antonini reported new medical findings one month later, Dr. DeMasi reversed this decision and approved another neurological exam. Medical decisions such as this are, at best, negligence. "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments

- 14 -

and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976); *see also Estelle*, 429 U.S. at 106; *Durham v. Nu'man*, 97 F.3d 862, 865 (6th Cir. 1996).

In addition, Mabry argues that Dr. DeMasi had some unspecified involvement in CMS's delay in obtaining his subsequent neurological consult. But Dr. DeMasi had no supervisory authority over or involvement with the scheduling process, and cannot be held accountable for something outside his control. *See Gibson*, 926 F.2d at 535.

### III. CONCLUSION

For those reasons, we **AFFIRM** the judgment of the district court.