NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0073n.06

Case No. 21-3424

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Feb 10, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| LISA BRITT, Administratrix of the Estate on behalf of Tommy W. Britt, II, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE SOUTHERN DISTRICT OF |
| | ) | OHIO |
| HAMILTON COUNTY, et al., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

Before: SUTTON, Chief Judge; CLAY and McKEAGUE, Circuit Judges.

SUTTON, Chief Judge. In 2016, police arrested Tommy Britt for a probation violation and took him to the Hamilton County Justice Center. Britt told officers at the jail that he had suffered from an addiction to heroin for the prior seven years, and he was treated for symptoms consistent with heroin withdrawal. For seven days, Britt remained largely stable, with vital signs elevated a few times but each time returning to normal and each time consistent with heroin withdrawal. On the eighth day, his condition deteriorated, and he was taken to the University of Cincinnati Hospital. Twenty days later, at 23 years old, he died from endocarditis, an infection in the lining of the heart caused by intravenous drug use. Tommy's mother sued several nurses at the jail, the medical services provider, NaphCare, Inc., and one of the corrections officers, Sergeant

Melissa Kilday. Invoking the Fourteenth Amendment, she claimed that they were deliberately indifferent to her son's health needs. The district court rejected the claims as a matter of law.

I.

On October 26, 2016, Tommy Britt was arrested for a parole violation and booked into the Hamilton County Justice Center. Prison staff conducted a medical screening and noted that his vital signs were relatively normal.

On October 27, medical staff evaluated Britt's physical and mental health. During the physical, he disclosed his heroin, benzodiazepines, and alcohol use, and he told them he last used heroin the day before. He also complained of severe pain and withdrawal symptoms. He received Ibuprofen and cold/cough medicine. The nurse reported a temperature of 98.5 degrees and a slightly elevated pulse of 105 beats per minute and noted that Britt looked fine, though he was depressed. During his mental health evaluation, Britt reported a history of substance abuse, bipolar disorder, and self-harm. He entered detox protocol, which required nurses to check his vital signs twice daily. During his vitals check that afternoon, his temperature, blood pressure, and pulse fell in the normal range.

On October 28 and 29, Britt continued to show withdrawal symptoms, including nausea, vomiting, and diarrhea, and received appropriate medication for these problems. Over the two days, his blood pressure and pulse were largely normal, and after they went outside the normal range at one point, they returned to normal.

On October 30, Britt again received medication for his withdrawal symptoms. Nurse Danielle McFarland conducted the first check-in and found his blood pressure to be normal, while his temperature was a slightly elevated 100.9 degrees and his pulse was 103 beats per minute. By the afternoon, his vitals had returned to normal. During these first four full days in jail, Britt talked

to his mother each day. She noted that "[h]e seemed like he was ok," though "he sounded a little sluggish." R.54 at 8.

On October 31, Nurse McFarland conducted a drug withdrawal assessment. She found his vitals were slightly outside the normal range, with a temperature of 100.9 degrees and a pulse of 107 beats per minute.

Later that day, guards found Britt on the cell floor and called in a medical emergency. Three nurses (McFarland, Allison Kolb, and Angela Moore) responded. One used ammonia inhalant to awaken him, and he responded favorably. Britt reported chest pains, became upset, pushed away the nurses, and said he needed to go to a hospital. He appeared alert and caught himself when he fell. After learning he was not going to the hospital, he acted erratically and unlike a "clear-minded individual." R.69-1 at 111.

Sergeant Melissa Kilday, a corrections officer, observed the scene. Based on her experience, she worried that Britt would try to hurt himself, potentially as a pretext to get sent to the hospital. Kilday consulted with the nurses, who felt he was faking some of his symptoms and did not need further attention. Kilday placed Britt in a restraint chair. Used for brief periods of time for inmates considered dangers to themselves, the chair has ankle, wrist, and seat-belt-like restraints. Britt's vitals revealed a pulse of 105 and normal blood pressure.

Britt sat in the restraint chair for two to three hours. Every 15 minutes, Nurse Moore checked on him, finding him alert, relaxed, and responsive, and at one point he told Nurse Moore that he felt better. At roughly the same time, Nurse Moore called Dr. Leland Johansen, a psychiatrist and physician, to explain what had happened and to get further direction. She let Johansen "know what [had] happened, told him [Britt's] vitals" and that Britt was "not feeling well." R.68-1 at 271–72. Dr. Johansen placed Britt on level one suicide watch, ensuring he was

3

monitored by corrections staff every ten minutes. Dr. Johansen did not tell the staff to take Britt to the hospital or to alter the care they were giving him in any other ways.

After Dr. Johansen moved Britt from a regular jail cell to a suicide watch cell on the evening of October 31, he was taken off the detox protocol, and the three nurses and Sergeant Kilday no longer interacted with him. While jail staff regularly observed him in this new cell, his vital signs were not regularly taken. On November 1, Britt met with a NaphCare social worker, who reported that he was cooperative, engaged, and oriented to time and place. Suicide precautions and monitoring stayed in place.

On November 2, a guard found Britt standing by the cell door lethargically, unable to answer questions, and noticed vomit and urine on the floor. A nurse responded to the scene, and she noticed his color was abnormal and that his pulse was 165 beats per minute. Jail staff transferred him to a nearby hospital. Doctors diagnosed him with endocarditis, which had damaged his heart valves and caused a stroke. He died 20 days later.

His mother, Lisa Britt, filed this lawsuit on behalf of his estate under § 1983, alleging that staff at the jail were deliberately indifferent to his medical needs in violation of the Fourteenth Amendment. She also brought various state law claims. The district court granted the defendants' motions for summary judgment and declined to exercise supplemental jurisdiction over the state law claims.

II.

The Fourteenth Amendment requires corrections officials to provide adequate medical care to pretrial detainees. *See City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). Officers violate that right when they display "deliberate indifference to serious medical needs." *Id.* at 243–44 (quotation omitted). The key question in this case goes to deliberate indifference: Did the

4

officers act "recklessly in the face of an unjustifiably high risk" that is either "known or so obvious that it should be known"? *Brawner v. Scott County*, 14 F.4th 585, 596–97 (6th Cir. 2021) (quotation omitted); *see Greene v. Crawford County*, 22 F.4th 593, 606 (6th Cir. 2022).

This is an objective inquiry, as *Brawner* and *Greene* note, one that asks whether the defendants acted recklessly in response to a danger, "even though a reasonable official" in their position would have known about an "excessive risk." *Brawner*, 14 F.4th at 597; *Greene*, 22 F.4th at 606. In answering this question, all agree that "negligence is insufficient." *Brawner*, 14 F.4th at 596. Instead, the standard requires objectively established "recklessness." *Greene*, 22 F.4th at 606. We consider each claim in turn.

*Response to heightened temperature (Nurse McFarland).* In conducting Britt's morning detox check-ins on October 30 and 31, McFarland did not recklessly disregard an obvious risk. Although Britt's heart rate and temperature were slightly higher than normal, they were close to the typical range. McFarland's conduct also was far less negligent than other conduct we have held did not create a triable issue of fact on deliberate indifference. The nurse in *Griffith v. Franklin County*, for example, failed to take immediate action responding to a urine test result that normally would have "required that [the detainee] be hospitalized." 975 F.3d 554, 563 (6th Cir. 2020). Here, McFarland found a temperature of 100.9 degrees and pulses of 103 or 107 beats per minute, neither of which was particularly beyond the normal range and both of which could have had a variety of causes, including the most obvious: stress from heroin withdrawal.

NaphCare's training slideshow, it is true, identified a "normal" body temperature as between 96.8 and 100.4 degrees and a "normal" pulse as between 60 and 100 beats per minute. R.60-1 at 172–73. Under its training guidance, it is also true, a nurse should talk to a doctor when she sees abnormal vital signs. "But we have held that the failure to follow internal policies, without

more, does not constitute deliberate indifference." *Griffith*, 975 F.3d at 578 (quotation omitted). The training documents also do not establish that a nurse would have seen an "obvious," "excessive" risk. An above-normal temperature can be "drug related" and "[v]arious factors" may cause a pulse to go up. R.60-1 at 172–73. The combination of an elevated pulse and temperature, it continued, merely "could be indicative of infection." *Id.* at 180. This is far from the kind of "unequivocal language" from medical experts that would reflect an "extreme and obvious" risk of endocarditis. *Griffith*, 975 F.3d at 575.

The report submitted by Britt's expert does not upend this conclusion. It says that McFarland's failure to ask further questions after taking Britt's temperature "was grossly negligent and below the standard of care" and that her training made her aware of a likely infection. R.84-3 at 7. But it is undisputed that the symptoms observed by McFarland were consistent with heroin withdrawal. The NaphCare training materials show as much. Perhaps a nurse "providing proper care would have, in an abundance of caution, caused [Britt] to see a physician." *Rouster v. County of Saginaw*, 749 F.3d 437, 453 (6th Cir. 2014). But McFarland's care could have risen to deliberate indifference only if Britt's "symptoms had been clearly inconsistent with [heroin] withdrawal" and she had failed "to confirm that his symptoms were not indicative of a different and more serious condition." *Id.* at 451; *see Jones v. Muskegon County*, 625 F.3d 935, 944–46 (6th Cir. 2010) (holding that treating an inmate, who turned out to have cancer, for constipation when some symptoms but not others were consistent with constipation amounted to negligence, not deliberate indifference).

*Response to deteriorating condition (Nurses McFarland, Kolb, and Moore).* Nurses McFarland, Kolb, and Moore responded to Britt's cell on the evening of October 31 after a guard

6

found him unresponsive. These claims may go to a jury only if there is a triable issue of fact as to whether the nurses were deliberately indifferent to his vital signs and other conditions.

No such dispute of fact exists. First, a "fail[ure] to take all vital signs," even of a detainee complaining of serious pain, "do[es] not rise above negligence." *Bowles v. Bourbon County*, No. 21-5012, 2021 WL 3028128, at *8 (6th Cir. July 19, 2021). Second, the data available to the nurses did not suggest an obvious risk that required a different course of action. They found Britt with a pulse of 105 and normal blood pressure. As noted, NaphCare training indicates that a pulse above 100 can have various causes, and it is undisputed that it is consistent with heroin withdrawal. Even if "it would have been preferable if [Moore] had immediately elevated [Britt's vital signs] to [a physician] rather than" waiting to speak to Dr. Johansen after Britt was in the chair, that does not amount to deliberate indifference. *Griffith*, 975 F.3d at 574. The nurses saw that Britt had stable (if slightly abnormal) vitals, appeared alert, and was able to catch himself while falling, which "in [their] experience indicated that his medical status was stable." *Id.*; *see Bowles*, 2021 WL 3028128, at *9 (holding that despite a detainee "in obvious pain, beating on his head with his fists, and throwing up in a bucket," "it was not more than negligent for [a nurse] to wait two hours for instruction" from a different medical provider). After Britt went into the restraining chair, Moore checked on him every 15 minutes, finding him relaxed and alert, and called Dr. Johansen to get his input on what to do next. The evidence does not indicate that they were deliberately indifferent to any obvious risk at any point.

Claiming the nurses' training should have alerted them to Britt's condition, the claimant points to a document instructing the nurses on detecting serious infections in inmates. But this document ultimately supports the conclusion that their choices did not rise to deliberate indifference. Among the signs that a detainee is suffering from infection-induced delirium, the

7

document points to "abnormal vital signs, like a heart rate of 140," visual hallucinations, and prisoners not knowing where they are. R.60-1 at 2. Britt's pulse was not remotely that abnormal, and no evidence shows he was hallucinating.

The nurses' involvement in placing Britt in a restraint chair for two to three hours also does not create a triable issue of fact over deliberate indifference. The nurses, Sergeant Kilday, and the head of medicine all agree that it was up to Kilday to order the restraint chair, and the nurses could offer guidance on whether that was medically possible. There was nothing deliberately indifferent about permitting Kilday to place him in the restraint chair for a few hours given his previously established and admitted risks of self-harm and his current condition.

Britt argues that McFarland's own statements in her deposition reveal that she ignored a known risk by not demanding a different course of action. McFarland testified that consciousness is an important factor in evaluating a withdrawal patient and one who had a fever for two days and was then found unconscious needs immediate medical attention. But the record does not show that Britt was unconscious or that he had a fever for two days straight. The undisputed testimony shows that ammonia would not have awakened him promptly had that been the case. Comments about how to treat a different patient do not show recklessness.

Nor does any failure to monitor Britt's vitals on the evening of October 31, on November 1, or on November 2 call this conclusion into doubt. None of these three nurses interacted with Britt after he left the restraint chair and was placed on suicide watch on October 31. They thus were not in a position to provide care to Britt during those days. Nor were the three nurses ultimately responsible for the decision to take Britt off regular detox monitoring or to move him to the suicide watch unit.

*Placing Tommy on Suicide Watch (Dr. Leland Johansen).* Dr. Johansen placed Tommy on suicide watch. But Britt abandoned any claims against Dr. Johansen in the district court. That makes them forfeited here.

*Unwritten policy and failure to train (NaphCare).* In view of the above conclusions, Britt's claim against NaphCare, a local health organization, fails under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). NaphCare "cannot be liable" under *Monell* in the absence of "an underlying constitutional violation." *Griffith*, 975 F.3d at 581.

*Sergeant Melissa Kilday.* As a corrections supervisor, Kilday was responsible for determining whether to order an inmate to the restraint chair, with input from the nursing team and any doctor as to whether the inmate could be safely placed there. Observing an increasingly upset Britt whose past self-harm was noted from the outset, Kilday placed him in the restraint chair for two to three hours to calm him down and prevent self-harm. Because Kilday knew that the medical team—both the nurses and the doctor—would monitor him while in the restraint chair for a few hours, her choice reflected an "active effort" to respond to any concerns about Britt's medical condition and did not amount to deliberate indifference. *Mabry v. Antonini*, 289 F. App'x 895, 903 (6th Cir. 2008); *see Clark-Murphy v. Foreback*, 439 F.3d 280, 287 (6th Cir. 2006).

Trying to fend off this conclusion, the claimant notes that Kilday said that her "concern was for him to see a doctor as soon as possible," R.65 at 18, suggesting that Kilday may have known Britt faced a serious medical need. But "our precedents do not require that prison officials take every possible step to address a serious risk of harm." *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020). No less importantly, Kilday knew that, once in the restraint chair, he would receive medical attention both from the nurses and doctor, as indeed happened. She ensured his medical

9

condition remained "under review" and would be treated later that night or the next morning. *Griffith*, 975 F.3d at 575. That is indeed what happened for Britt over the next two days.

The claimant also invokes a post-incident report, filled out by a subordinate of Kilday, saying that Britt was put in the restraint chair "for faking unresponsiveness and abusing inmate [privileges]," R.68-1 at 87, suggesting the point was to punish Britt, not handle the suicide risk or otherwise get him medical care. But the form does not create a triable issue of fact over Kilday's statements and actions showing that he needed protection from a suicide risk and medical attention. The suicide risk was present from the outset due to a history of self-harm admitted by Britt. And the nurses and doctor indeed gave him medical care, as confirmed by the reality that his condition did seem to stabilize by the next day. It simply is not the case that Kilday ignored Britt's medical needs. She responded to the scene and let the nursing staff "do[] their thing" in assessing him. R.65 at 15. She knew Britt would be checked by medical staff regularly and a doctor would be involved after ordering him to the restraint chair. That is not deliberate indifference.

Plus, there is a causation problem with this claim anyway. The claimant offers no explanation why it would have made a difference if Kilday, instead of putting Britt in a restraint chair for two to three hours, had placed him in his cell for that same period of time. *See Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 659 (6th Cir. 1994). No reasonable juror could find that the restraint chair placement caused any harm relative to the alternative—leaving him "in his cell"—without self-harm monitoring. R.65 at 18. The choice of the chair, recall, brought with it medical attention, and he was monitored every 15 minutes while in the chair.

A few words are in order in response to the dissent. It claims that we have "misapplie[d] the applicable law" by failing to apply the *Brawner* recklessness standard and by citing pre-*Brawner* cases in our decision. Dissent at 2. But from beginning to end, we have applied the

recklessness test for determining the existence of deliberate indifference. That we have relied on pre-*Brawner* cases for *other* aspects of the deliberate-indifference inquiry is hardly unusual. What would be unusual would be to assume that *Brawner* overruled all of these cases, even those that dealt with other issues and even those that relied on alternative grounds when they addressed the state-of-mind inquiry. *See, e.g.*, *Griffith*, 975 F.3d at 570. The dissent also claims that we should rely on the district court's one-sentence statement that it would have handled the claims against the nurses differently if recklessness were the test. Dissent at 1. But we look at a district court's summary judgment decisions with fresh eyes. That indeed is just what the dissent has done. It would reverse not just the district court's resolution of the claims against the *nurses* but also its resolution of the claims against Sergeant Kilday, even though the district court never said a recklessness test would affect its decision as to *that defendant*.

For these reasons, we affirm the grant of summary judgment.

11

Case No. 21-3424, *Britt v. Hamilton County, et al.*

**CLAY, Circuit Judge, dissenting.** In granting Defendants' motions for summary judgment, the district court concluded as follows:

> "[I]f analyzed under *Kingsle*y's solely objective test, Plaintiff has presented sufficient evidence to raise at least one genuine dispute of material fact that would allow her to escape summary judgment: a juror *could* find that a reasonable nurse in [Defendants'] position *should* have concluded that Britt was suffering from an infection or endocarditis."

*Britt v. Hamilton Cnty.*, 531 F. Supp. 3d 1309, 1326 (S.D. Ohio 2021) (emphasis in original). Following the district court's entry of its order for summary judgment, we clarified that the deliberate indifference test for pretrial detainees is indeed the objective test. *Brawner v. Scott County, Tenn.*, 14 F.4th 585, 596–97 (6th Cir. 2021); *Greene v. Crawford Cnty., Mich.*, 22 F.4th 593, 607 (6th Cir. 2022). Nevertheless, the majority analyzes Plaintiff's claims in light of prior, now obsolete, cases that relied on a subjective test analysis. *See* Majority at 5–7. In predicating its analysis on the subjective test, while denying that it is doing so, the majority effectively ignores the district court's assertion that it never would have granted summary judgment in the first place based upon the majority's approach. The majority also minimizes the extent of material disputed facts between the parties and, contrary to the standards governing summary judgment motions, repeatedly draws favorable inferences regarding disputed facts in favor of Defendants instead of Plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); Fed. R. Civ. Proc. 56. Because the record raises genuine and material factual disputes as to Defendants' alleged deliberate indifference to the deceased's medical needs in violation of the Fourteenth Amendment, I would reverse the district court's order granting Defendants' motions for summary judgment and remand Plaintiff's claims so they can be heard by a jury.

12

I.

First, the majority misapplies the applicable law. While the majority concedes that Plaintiff's deliberate indifference claims require us to apply an objective test, it nevertheless compares Defendants' actions, and inactions, to prior cases where we applied a subjective test. *See* Majority at 5–7 (citing *Griffith v. Franklin Cnty.*, 975 F.3d 554, 568 (6th Cir. 2020) ("[T]he only issue is whether Griffith satisfied the *subjective component*.") (emphasis added); *Rouster v. Cnty. of Saginaw*, 749 F.3d 437, 451 (6th Cir. 2014) ("We cannot conclude under these facts that [Defendant] was *subjectively aware* that [the detainee] suffered from a serious medical condition and chose to ignore his need for treatment.") (emphasis added); *Jones v. Muskegon Cnty.*, 625 F.3d 935, 942 (6th Cir. 2010) ("The central issue, therefore, is whether Plaintiff presented evidence to establish the *subjective component* that each Defendant acted with deliberate indifference toward Jones's serious medical needs.") (emphasis added)); *but see Brawner*, 14 F.4th at 596–97; *Greene*, 22 F.4th at 606–07.

The majority also draws erroneous conclusions from those comparisons. For example, it incorrectly suggests that our cases preclude a deliberate indifference finding where a defendant fails to follow institutional protocols and/or fails to rule out the possibility of multiple serious medical needs. *See* Majority at 5–7. But our opinions in *Brawner* and *Greene* changed the landscape for analyzing such questions; we clarified in those cases that the deliberate indifference analysis now requires "less than subjective intent." *Brawner*, 14 F.4th at 596; *Greene*, 22 F.4th at 606 ("This Court's opinion in *Brawner* changed things . . . . We are bound by that decision.") Accordingly, pretrial detainees need only prove "something akin to reckless disregard" given that the Due Process Clause of the Fourteenth Amendment may be violated by officials who are not

13

subjectively aware that their actions exposed a pretrial detainee to a serious harm. *Brawner*, 14 F.4th at 596; *see also Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017).

In this case, the district court explicitly concluded that if we eliminated the subjective prong of the now-obsolete deliberate indifference test, "Plaintiff has presented sufficient evidence to raise at least one genuine dispute of material fact that would allow her to escape summary judgment . . . ." *Britt*, 531 F. Supp. 3d at 1326. Consequently, the majority upholds entry of summary judgment by a district court which itself stated that, under the applicable current legal authority, it would have been inappropriate to enter summary judgment in the first place.[1]

II.

The majority also provides an incomplete recitation of the relevant facts and the parties' corresponding disputes. One week passed between Tommy Britt's initial detention at the Hamilton County Justice Center ("jail") and his transfer to the local hospital, where doctors quickly admitted him to the intensive care unit and confirmed that he was suffering from endocarditis and the effects of multiple strokes. The record shows that Defendants acted with deliberate indifference toward Tommy's serious medical needs at various points over the course of that week. First, when Tommy was booked into custody, the jail staff allegedly completed a medical screen; however, despite Tommy's history of substance abuse, the record shows that Defendants did not record any "of the

---

[1] In one paragraph at the end of its opinion, the majority responds with several broad statements. First, it claims that it faithfully "applied the recklessness test for determining the existence of deliberate indifference." Majority at 11. But this conclusory statement does not resolve the majority's reliance on cases that depend on the now-invalidated subjective prong of the deliberate indifference test. To be sure, our opinions in *Brawner* and *Greene* did not overrule *all aspects* of every case that predated those opinions; however, *Brawner* and *Greene* did overrule the legal standard that decided the deliberate indifference question in many of our prior cases, including *Griffith*, *Rouster*, and *Jones*.

Additionally, the fact that the district court did not say that it would alter its outcome as to all Defendants if we subsequently altered the deliberate indifference test does not preclude our ability, reviewing the district court's entry of summary judgment on Plaintiff's claims *de novo*, to determine that summary judgment is inappropriate as to all Defendants, including Sergeant Kilday as well as the nurses.

intake questions detailing specific substances," including Tommy's prior intravenous drug use. (R. 84-3, Page ID # 6152–53; *See* R. 68-1, Page ID # 5128, 5131–32.)

Over the course of the subsequent days, between October 26, 2016, and October 31, 2016, Tommy experienced a wide range of adverse physical, behavioral, and cognitive symptoms, and he repeatedly requested to be taken to the hospital. Those symptoms included: shortness of breath, nausea, vomiting, diarrhea, nasal congestion, sinus pressure, cough, sore throat, headache, visual hallucinations, agitation, back pain, and "abnormal vital signs," as reported by Defendants.[2] The extent and aggravation of Tommy's abnormal vital signs is clear: his temperature and pulse rose over the course of his incarceration. Indeed, after remaining steady between 98 and 98.5 degrees during his first four days at the jail, Tommy's temperature rose to 100.9 degrees on October 30th and October 31st. His pulse also rose during that time, reaching 100 beats per minute or more on October 27th, 28th, 29th, 30th, and 31st.[3] The combination of these symptoms and Tommy's history of intravenous drug use were consistent with endocarditis, an infection of the lining of the heart caused by intravenous drug use. *See* Majority at 1. The record suggests that Defendants were well aware of the high risk that drug-addicted jail inmates might suffer from endocarditis given the fact that they "constantly see a lot of people detoxing" and due to Defendants' familiarity with the opioid crisis gripping the region. (R. 64, Page ID # 4376.)

Critically, Plaintiff's medical expert, Dr. Mendel, determined that Tommy would have "survived to hospital discharge with timely evaluation by a physician or mid-level provider." (R. 84-3, Page ID # 6156.) Indeed, the record shows that a reasonable jury could determine that Defendants were on notice

---

[2] Defendants confirmed that Tommy's vital signs were abnormal on multiple days over the course of Tommy's incarceration. They did so by placing a checkmark next to the word "Yes" in response to the prompt "Abnormal Vital Signs" within the NaphCare record-keeping dialogue system. (R. 68-1, Page ID # 5102, 5107, 5118, 5139.)

[3] Tommy's pulse fluctuated on October 27th and 28th. Nevertheless, those days marked the beginning of a seven-day period during which Tommy's pulse readings rose above 100 beats per minute.

that Tommy was suffering from an infection, even if many of Tommy's symptoms also aligned with withdrawal. A reasonable jury could find that Defendants recklessly failed to arrive at a proper diagnosis by declining to consider the *various* possible conditions that may have been causing Tommy's symptoms; it could find that Defendants failed to distinguish and evaluate Tommy's symptoms and failed to develop a comprehensive treatment plan that addressed Tommy's *multiple* medical needs. Such a jury could have relied on Dr. Mendel's testimony, which concluded that Defendants acted recklessly in light of their training (by NaphCare and by virtue of their professional backgrounds), their awareness of Tommy's symptoms, and their failure to provide Tommy with adequate examinations, treatment, and referrals.

The record also suggests that Defendants acted with deliberate indifference toward Tommy's serious medical needs in light of his drug withdrawal. It shows that Defendants only narrowly followed a treatment plan that addressed Tommy's *symptoms*,[4] rather than tailoring a plan and medication regime to treat his *addiction*. Despite knowing that Tommy was withdrawing from heroin, benzodiazepines, and alcohol, the record makes clear that the drugs provided to Tommy by Defendants were limited to over-the-counter cold medications and Ibuprofen. The record is bereft of any indication that Defendants assessed or referred Tommy for prescriptions to medically address his addiction and corresponding withdrawal.

Additionally, there are disputed facts in regard to Defendants' deliberate indifference on October 31, 2016, when Defendants called a "George-100," code for when an inmate needs emergency medical treatment, and proceeded to place Tommy in a restraint chair.[5] (R. 68-1, Page ID # 5139.) While

---

[4] Notably, the only explanation ever offered by Defendants that directly addressed the deficiency of their response to Tommy's acute medical symptoms and obvious physical distress was their assumption that Tommy was "faking" several of those symptoms. (R. 68-1, Page ID # 5139; R. 58-1, Page ID # 3257.)

[5] The majority mischaracterizes Plaintiff's claim in regard to Defendants' decision to place Tommy in the restraint chair on October 31, 2016. It states that "there is a causation problem" because "[t]he claimant offers no explanation why it would have made a difference if Kilday, instead of putting [Tommy] in a restraint chair for two to three hours, had placed him in his cell for that same period of time." Majority at 11. However, Plaintiff's argument is not that Tommy would have been better off in his cell than in the restraint chair during the time that he was strapped in the restraint chair; instead, Plaintiff's contention is that Tommy was in dire need of emergency medical attention or hospitalization and should not have been simply left to his own devices in the restraint chair *or in his cell*. Defendants' decision in this regard was just one example of the many reckless and misinformed instances of Defendants' deliberate indifference toward Tommy's serious medical needs. (Appellant's Br. 3, 15–19.)

Defendants *claim* that they notified their superior, Dr. Johansen, about "what had happened, told him [Tommy's] vitals," and stated that Tommy was "not feeling well" when they allegedly sought direction from the doctor on October 31st, the record fails to confirm this version of events. *See* Majority at 4 (referencing R. 68-1, Page ID # 271–72). To the contrary, Dr. Johansen testified that, on that day, 1) he did not order the use of the restraint chair before Defendants strapped Tommy in it, 2) he did "not know the circumstances," or "how it happened," and 3) he could not recall whether, at the time when Defendants called him, he understood "the issue as to why [Tommy] was being put in the chair." (R. 69, Page ID # 5346.)

As Plaintiff points out in her reply brief, we cannot premise our judgment about the serious risks that Defendants did or did not address on conclusory testimony provided by individual Defendants. (*See* Reply Br. 17.) And although Dr. Johansen referred Tommy to a suicide supervision unit on October 31st, meaning that his vital signs were no longer monitored by Defendants under the jail's detox protocol, there remain factual disputes about whether Defendants' reckless failure to properly and adequately inform Dr. Johansen about Tommy's medical status and symptoms caused other staff members to refrain from providing Tommy with adequate treatment and monitoring over the subsequent two days. *See generally* Majority at 4 (noting that Tommy's vital signs were not regularly taken after October 31st). A reasonable jury could find that it was because of Defendants' deliberate indifference toward Tommy that the jail failed to properly assess and treat his medical problems until it was too late; and as a direct and proximate result, Tommy was found in his cell surrounded by urine and vomit and with "his carotid artery . . . pulsating out of his neck . . . very, very fast."

In the summary judgment context, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are *jury functions*, not those of a judge . . . ." *Anderson*, 477 U.S. at 255 (emphasis added). Because the record raises genuine and material disputes of fact regarding Defendants' alleged indifference toward Tommy Britt's serious

medical needs during the week of his incarceration, I would reverse the district court's order granting Defendants' summary judgment motions and remand for further proceedings.